# EXHIBIT A

 **Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
04/21/2025
CT Log Number 548931112

## Service of Process Transmittal Summary

**TO:**   Ross H. Parr, Senior Vice President - Legal Affairs
Old Dominion Freight Line, Inc.
500 Old Dominion Way
Thomasville, NC 27360-8923

**RE:**   **Process Served in Kentucky**

**FOR:**   Old Dominion Freight Line, Inc.  (Domestic State: VA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Re: DYMOND MCCATHERN // To: Old Dominion Freight Line, Inc. |
| **CASE #:** | 25CI002839 |
| **NATURE OF ACTION:** | Employee Litigation - Wrongful Termination |
| **PROCESS SERVED ON:** | C T Corporation System, Frankfort, KY |
| **DATE/METHOD OF SERVICE:** | By Traceable Mail on 04/21/2025 |
| **JURISDICTION SERVED:** | Kentucky |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 04/21/2025, Expected Purge Date: 04/26/2025 |
| | Image SOP |
| | Email Notification,  Kelly Fesperman  kelly.fesperman@odfl.com |
| | Email Notification,  Ross H. Parr  ross.parr@odfl.com |
| | Email Notification,  Peter Murphy  Peter.murphy@odfl.com |
| | Email Notification,  Wendy English  wendy.english@odfl.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 306 W. Main Street |
| | Suite 512 |
| | Frankfort, KY 40601 |
| | 866-401-8252 |
| | LargeCorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

CERTIFIED MAIL™

quadient
FIRST-CLASS MAIL
IMI
**$017.96** ⁰
04/14/2025 ZIP 40601
043M31236114

US POSTAGE

David L. Nicholson, Jefferson
Circuit Clerk
600 West Jefferson Street
Louisville, KY 40202-4731



## USPS CERTIFIED MAIL

Case Number: 25-CI-002839

9236 0901 9403 8309 6536 84

Package : 000001 of 000044

Restricted Delivery

CT CORPORATION SYSTEM
306 WEST MAIN STREET SUITE 512
FRANKFORT, KY 40602
Case Number: 25-CI-002839

Presiding Judge: HON. JESSICA E. GREEN (630423)



## KCOJ eFiling Cover Sheet

Case Number: 25-CI-002839

Envelope Number: 10340924

Package Retrieval Number: 1034092467682582@00001100404

Service by: Certified Mail

Service Fee:  $ 0.00

Postage Fee: $ 20.28

The attached documents were generated via the Kentucky Court of Justice eFiling system. For more
information on eFiling, go to http://courts.ky.gov/efiling.

ackage : 000001 of 000044





| | | |
|---|---|---|
| AOC-E-105        Sum Code: CI<br>Rev. 9-14<br><br>Commonwealth of Kentucky<br>Court of Justice      Courts.ky.gov<br><br>CR 4.02; Cr Official Form 1 | **CIVIL SUMMONS** | Case #:  **25-CI-002839**<br>Court:   **CIRCUIT**<br>County: **JEFFERSON Circuit** |

*Plantiff,* **MCCATHERN, DYMOND VS. OLD DOMINION FREIGHT LINE, INC. ET AL,** *Defendant*

TO:  **CT CORPORATION SYSTEM**
       **306 WEST MAIN STREET SUITE 512**
       **FRANKFORT, KY 40602**

Memo: Related party is OLD DOMINION FREIGHT LINE, INC.

The Commonwealth of Kentucky to Defendant:
**OLD DOMINION FREIGHT LINE, INC.**

   You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

*Davis L. Nicholon*

Jefferson Circuit Clerk
Date: **4/13/2025**

---

### Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

To: _____

☐ Not Served because: _____

Date: _____, 20_____          _____
                                                              Served By

                                                       _____
                                                              Title

Summons ID: 1034092467682582@00001100404
CIRCUIT: 25-CI-002839 Certified Mail
MCCATHERN, DYMOND VS. OLD DOMINION FREIGHT LINE, INC. ET AL

Page 1 of 1

Package : 000003 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000003 of 000044



eFile



CASE NUMBER _____

COMMONWEALTH OF KENTUCKY
JEFFERSON CIRCUIT COURT
DIVISION ___

*Electronically Filed*

DYMOND MCCATHERN                                          PLAINTIFF

v.

OLD DOMINION FREIGHT LINE, INC.                          DEFENDANT
1400 SOUTH LOUIS COLEMAN JR. DRIVE
LOUISVILLE, KENTUCKY  40211

    SERVE:    C T Corporation System
                306 West Main Street
                Suite 512
                Frankfort, Kentucky 40601

MIKE HAUSMAN                                              DEFENDANT
1400 SOUTH LOUIS COLEMAN JR. DRIVE
LOUISVILLE, KENTUCKY  40211

    SERVE:    Mike Hausman
                1400 South Louis Coleman Jr. Drive
                Louisville, Kentucky  40211

## **COMPLAINT**
*Trial by Jury Demanded*

Comes now Plaintiff, Dymond McCathern ("Ms. McCathern" or "Plaintiff"), by and through her counsel, and for her Complaint against the Defendants, Old Dominion Freight Line, Inc. and Mike Hausman, (hereinafter "ODFL" or "Hausman" individually, or "Defendants" collectively).  Ms. McCathern brings this action to remedy the Defendants' unlawful conduct and secure any and all relief necessary to restore her rights under Kentucky law and to compensate her for damages sustained.  In accordance therewith, Plaintiff alleges as follows:

Package : 000005 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000005 of 000044



## PARTIES

1. Ms. McCathern resides in Louisville, Kentucky. Ms. McCathern was an employee of ODFL from October 2022 to January 14, 2024.

2. Defendant ODFL is a foreign corporation doing business in the Commonwealth of Kentucky. ODFL's principal place of business is 500 Old Dominion Way, Thomasville, North Carolina 27360. ODFL owns and operates a logistics facility in Louisville, Kentucky.

## JURISDICTION AND VENUE

3. Plaintiff's causes of action are brought pursuant to the Kentucky Civil Rights Act ("KCRA"), KRS 344.040 and KRS 344.280.

4. Jurisdiction is proper in the Jefferson Circuit Court pursuant to KRS § 23A.010(1).

5. Venue in this action is proper in the Jefferson Circuit Court pursuant to KRS 452.460(1) because, *inter alia*, injury arising from these events was done to Plaintiff in Jefferson County.

## FACTUAL ALLEGATIONS

1. In or around October 2022, ODFL hired Ms. McCathern as a Pickup and Delivery Supervisor.

2. Her duties consisted largely of supervising and directing tasks to drivers, managing the dock, and completing any related paperwork.

3. Ms. McCathern strove to maintain a productive and respectful work environment and took great pride in her work and the contributions she made to the company. She was very committed to her role and performed her job satisfactorily.

4. In the latter half of 2024, Ms. McCathern began experiencing problems with the behavior

Package : 000006 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

Package : 000006 of 000044

of Leann Bolyard, a driver whom she supervised.

5.  Specifically, Ms. Bolyard's conduct in the workplace was in contravention of company policies and created a hostile work environment for Ms. McCathern and other ODFL employees.

6.  Ms. Bolyard made many sexual innuendos and displayed inappropriate behavior in the workplace.

7.  For example, on one occasion, Ms. Bolyard was in the office where Ms. McCathern was working and held an empty paper towel roll in front of a male co-worker and asked, "Can it fit in it?" – alluding to sexual conduct.

8.  On another occasion, Ms. Bolyard came into the office where Ms. McCathern was along with other employees and supervisors and observed a piece of gummy candy shaped like female breasts. Ms. McCathern then observed Ms. Bolyard looked at the candy and said, "Oh, I have these too," and proceeded to shake her breasts and buttocks. Ms. McCathern was made extremely uncomfortable by this.

9.  Shortly after that, Ms. Bolyard, incredibly, accused Ms. McCathern of having her "excommunicated" from her church – which was completely false.

10. Ms. McCathern learned that Ms. Bolyard was "excommunicated" from her church because a churchgoer had learned of Ms. Bolyard shaking her breast and buttocks in front of her co-workers.

11. Ms. McCathern assured Ms. Bolyard that she had nothing to do with that.

12. Notably, Ms. Bolyard did not accuse the male co-worker who witnessed the incident, and just so happens to be a member of the same church.

13. Nevertheless, Ms. Bolyard insisted that Ms. McCathern was responsible for the fallout with

Package : 000007 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

Package : 000007 of 000044



her church, and stated, "If I lose my job, you better believe you're going to lose your job, too."

14. Ms. McCathern reported Ms. Bolyard's accusations to Human Resources, and the underlying incident, but Ms. Bolyard was never disciplined.

15. Ms. Bolyard treated Ms. McCathern with hostility and less favorably than her White co-workers.

16. For example, Ms. Bolyard frequently hung up the phone on Ms. McCathern when she was directing Ms. Bolyard to perform a task.

17. On the other hand, when Ms. Bolyard would call Ms. McCathern to complain or berate her in a disrespectful and profane manner, Ms. McCathern would likewise end the conversation. Ms. Bolyard would call back and threaten Ms. McCathern, making comments such as, but not limited to, "hang up on me one more time, and all hell will break loose."

18. Ms. Bolyard, on multiple occasions, would call Ms. McCathern racial slurs to ODFL drivers, including the N-word.

19. In particular, Ms. Bolyard would make these comments to John Schmitt, another driver, who was quite uncomfortable with her language.

20. Mr. Schmitt relayed Ms. Bolyard's comments to Ms. McCathern, stating that he believed she was racist and that he had already reported it to Human Resources and management.

21. Ms. McCathern had already dealt with racist attitudes from ODFL's drivers.

22. In August or September 2024, Ms. McCathern reported to Mike Hausman, ODFL Service Center Manager, and the Human Resources department that employees, specifically drivers, were making racially charged comments, including statements such as "Black

Package : 000008 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

Package : 000008 of 000044

Lives Matter is bullshit to them," "That [BLM] only came about when Obama was in office," and "The reason Joe Biden is president is because we allow him to come to the Black neighborhoods and put these signs in our yard."

23.   When Ms. McCathern conveyed these concerns to Mr. Housman, she felt deeply humiliated and was visibly emotional, to the point of tears.

24.   The distress caused by the treatment she was experiencing from employees led her to leave work for the day.

25.   After leaving, she contacted HR to explain why she had to leave and to request the use of her PTO due to the emotional toll of the situation.

26.   During her conversation with Mr. Housman, another employee, Andrea Spencer, was present in the office. Although Ms. Spencer was not Ms. McCathern's supervisor, Mr. Housman said she had to be there as a witness. However, when Ms. McCathern later spoke with Mary in HR, she was informed that Ms. Spencer should not have been present during the meeting.

27.   In addition to Ms. Bolyard's accusation that Ms. McCathern caused her to be "excommunicated" from church, Ms. Bolyard frequently made baseless accusations about Ms. McCathern to other employees.

28.   On one occasion, Ms. Bolyard was spreading rumors in the workplace that Ms. McCathern favored Earl Civils, another driver, because "he was allowed to get more hours than everyone else." Not only was this untrue, but it created a negative perception of Ms. McCathern in the eyes of her subordinates.

29.   Ms. McCathern was the only Black female in a supervisor position during the nightshift, and the only supervisor that Ms. Bolyard treated this way.

Package : 000009 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000009 of 000044



30.  At one point, Ms. Bolyard approached Ms. McCathern and began to ramble about how she is "not racist" – when Ms. McCathern had never made such an assertion to Ms. Bolyard before.

31.  The night-shift clerk was a high turnover position.

32.  The night-shift clerk position was an hourly position and was not exempt from overtime requirements.

33.  Management delegated night-shift clerk responsibilities to Ms. McCathern without additional pay or equal distribution among other supervisors. Ms. McCathern was not the lowest seniority supervisor, and there was no other reason why Ms. McCathern was required to perform another position's duties in addition to her own.

34.  The clerk's responsibilities consisted of billing, data entry, scanning, and hazmat paperwork, among other clerical duties.

35.  This frequently resulted in Ms. McCathern working hours past her shift – which she did not have the option to accept or decline.

36.  Mark Logan, the Assistant Manager at this ODFL location, frequently made deeply offensive and racially charged remarks, in the presence of Black employees – including Ms. McCathern.

37.  Specifically, Mr. Logan said that he "shot a monkey." When Ms. McCathern questioned what he meant, Mr. Logan would simply repeat, "I've shot a monkey."

38.  Additionally, Mr. Logan made a point to inform Ms. McCathern that he resides on a "slave cemetery."

39.  On or around September 30, 2024, Mr. Logan issued Ms. McCathern a "final" Employee Performance Review ("EPR") and falsely claimed MS. McCathern had been insubordinate.

Package : 000010 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

Package : 000010 of 000044

40. The night that was the subject of the EPR was quite busy, and Ms. McCathern had been working for twelve hours without a lunch break – performing both her supervisory duties and the clerk's responsibilities.

41. Mr. Logan was also working that night. While he is the Assistant Manager, he tends to micromanage the supervisors – including Ms. McCathern – attempting to interfere with their independent judgment and performance of their positional responsibilities, rather than guiding their decision-making and performance.

42. This night in particular, Mr. Logan was frustrated with how busy the supervisors were. Mr. Logan wanted a trailer door moved, but Ms. McCathern had already asked the driver to move some trailers on their side because other drivers were outside waiting for a place to put their trailers.

43. For as long as Ms. McCathern worked at ODFL, it had always been protocol to maneuver the trailers in this manner during busy times.

44. When she explained this to Mr. Logan, he became angry and stated that he had previously directed Ms. McCathern to order drivers to pull to his side first.

45. Ms. McCathern questioned this logic, as they need both sides cleared regardless. She further explained that she did not tell the drivers what side to do first but merely asked them to move the trailers.

46. Mr. Logan raised his voice, stating, "Well, you need to listen to me! You do understand that I am your boss." Ms. McCathern replied, "I understand that. Do you want to go into the office to talk about it?"

47. Several employees surrounded Mr. Logan and Ms. McCathern as this conversation unfolded.

Package : 000011 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000011 of 000044



48.  Mr. Logan refused to speak privately, and stated, "We don't have to go in there and talk about it. I'll talk to you about it tomorrow."

49.  Ms. McCathern offered to go into the office because she began to feel severely humiliated as she was disrespected and yelled at by Mr. Logan in a room full of her co-workers and subordinates.

50.  As the night progressed, Mr. Logan became more and more agitated at the idea of not getting his way. Eventually, Mr. Logan began yelling, using profanity, and threw his clipboard on the ground and his pencil at the wall. Ms. McCathern was doing her job while watching it all unfold and became very uncomfortable and scared.

51.  About two hours past the end of Ms. McCathern's scheduled shift, she finally finished all her supervisory duties and the assigned clerical work. She then walked out of the office and past Mr. Logan, telling him to have a good night.

52.  Mr. Logan questioned, "Where do you think you're going?" to which Ms. McCathern said she was going home. Mr. Logan said nothing in response and left.

53.  Ms. McCathern gathered her things and began walking out, when Mr. Logan followed behind and asked again, "Where are you going?" to which Ms. McCathern repeated that she was going home and asked if there was something else he needed or if he needed her to stay. Mr. Logan then rolled his eyes at her, turned around, and went back into the office.

54.  Ms. McCathern was confused and didn't know why Mr. Logan was acting this way, but she had already performed her responsibilities for the night and left around one to two hours after the conclusion of her scheduled shift.. About 15 minutes later, Ms. McCathern received a call from Mr. Logan, asking, "Did you leave?" to which she said "Yes, I am on my way home." Mr. Logan said, "I told you not to leave," to which Ms. McCathern

Package : 000012 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

Package : 000012 of 000044

reminded him that she had specifically asked whether he needed her to stay, and he said nothing.

55. On or about October 2, 2024, Ms. McCathern reported Mr. Logan's behavior to Mike Hausman, ODFL Service Center Manager, who thanked her for informing him of the matter, and stated he would speak with Mr. Logan because he should not be behaving in that manner.

56. Mr. Hausman then began to excuse Mr. Logan's hostility and aggression in the workplace because "he is military," and every person has their own "management style." Ms. McCathern did not accept this excuse, and expressed that, regardless of his military status, his behavior is inexcusable in the workplace.

57. On or about Friday, October 4, 2024, Ms. McCathern emailed Mary Green, HR Area Manager, and Ernest Loveless, HR Development Regional Manager, requesting a call to report Ms. Bolyard's actions.

58. Shortly thereafter, Ms. Green called Ms. McCathern, where she reported that Ms. Bolyard called her the N-word in multiple conversations with other employees in the workplace, which created a hostile work environment for her and other employees.

59. Ms. McCathern further reported Ms. Bolyard's insubordination, disrespect, threats, and unsubstantiated accusations as detailed above. Despite a corroborating report from Mr. Schmitt, Ms. Bolyard was never disciplined for her behavior.

60. There are no HR personnel on-site at ODFL's Louisville location. The closest HR is located in Indianapolis, IN – where Mr. Loveless and Ms. Green are located, and who are the point of contact for employees at the ODFL location Louisville, KY. Michael Ferrell is the Regional HR & Development Manager and supervises Mr. Loveless and Ms. Green.

Package : 000013 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000013 of 000044



61. On Friday, October 11, 2024, around 8:00 PM, Ms. McCathern emailed multiple individuals within the HR Department, including Mr. Loveless, Ms. Green, James Siefert, Matthew Rimi, and DeeDee Cox, the HR Department Vice President, and attached a letter outlining her complaint, and all of the above-incidents of discrimination and harassment she had experienced at the hands of management and subordinates at ODFL in the previous several months.

62. Ms. McCathern outlined what actually transpired on September 30, 2024, as opposed to Mr. Logan's inaccurate account of events.

63. She informed HR that surveillance footage and other employees can corroborate her story. Ms. McCathern further questioned the issuance of a "final" EPR, considering that she had no recent write ups related to job performance or other similar incidents.

64. Only 11 minutes later, Ms. Cox replied that, since it appeared Ms. McCathern had already spoken with Mr. Loveless and Ms. Green, that she would have Jerry McGlown reach out to her, and that he reports directly to Ms. Cox. Mr. McGlown never contacted Ms. McCathern.

65. That same night, October 11, 2024, at 11:17 PM, Mr. Hausman issued Ms. McCathern a "final" write up for "overall poor job performance" based on Mr. Logan's version of events as set forth in her EPR.

66. Mr. Logan alleged that Ms. McCathern was given "a task to make sure the next driver to the window pulled some loaded trailers and replaced them with empties so we could continue to load freight. This was noticed about 30 min later and [Mr. Logan] questioned [Ms. McCathern] about it and she changed the plan, therefore, failing to execute the task that was given at the time."

Package : 000014 of 000044     Presiding Judge: HON. JESSICA E. GREEN (630423)     Package : 000014 of 000044

67.    It continued to read that, around 10:30 PM. Mr. Logan asked Ms. McCathern:

> [H]ow many drivers were still out? [Ms. McCathern] said she still
> had Harry [driver] to come back and process, [Mr. Logan] ask[ed]
> her to stay until Harry (*sic*) arrived back (*sic*) and the work was
> completed. [Mr. Logan] came back from the dock 15 min later and
> [Ms. McCathern] was gone. [Mr. Logan] called her and she said that
> Harry was the last of the drivers and that she had left. This was once
> again the failure to follow and execute a task given.

68.    On Thursday, October 17, 2024, Mr. Ferrell emailed Ms. McCathern, requesting she call

him the following day – which she did. After getting off the phone with Mr. Ferrell, Ms.

McCathern emailed him a summary of their phone conversation. Therein, Mr. Ferrell

informed Ms. McCathern that employees were interviewed and none of them substantiated

her report that Mr. Logan was screaming, cursing, and throwing objects in the workplace.

69.    However, Ms. McCathern previously provided HR with a timeframe of when the acts

occurred to confirm on the surveillance footage. Mr. Ferrell further confirmed that HR did

not investigate the video surveillance regarding object-throwing because of the "timing of

the reported behavior," but Ms. McCathern reported the incident two days after it occurred

– with plenty of time to obtain and review the relevant footage.

70.    Mr. Ferrell further indicated that Ms. McCathern's EPR was submitted prior to her report

of discrimination and hostile work environment, however, Ms. McCathern had made

multiple reports prior to the incident on September 30, 2024.

71.    He further stated that any further reports she made would be forwarded to Mr. Loveless,

and Ms. McCathern reminded Mr. Ferrell that she had yet to receive clarification on the

allegations prompting her final EPR from HR.

72.    On or around the week of December 16, 2024, ODFL management brought in a new

employee and ordered Ms. McCathern to train them without providing her prior notice.



Ms. McCathern explained that this was not communicated to her and would require her to work overtime.

73. None of Ms. McCathern's White counterparts were required to work overtime, and Ms. McCathern was frequently held past her shift to perform duties outside of her job description.

74. Nonetheless, Ms. McCathern did as ordered and trained the employee that night. Ms. McCathern and the trainee engaged in a casual conversation during downtime and in-between tasks.

75. At one point during the night while Ms. McCathern and the trainee were loading, Mr. Logan stated, "Is anybody listening to me? I've been talking to y'all, asking y'all questions, and y'all been ignoring me…Y'all been talking about everything else, but work."

76. Ms. McCathern and the trainee looked at one another, confused, and Ms. McCathern asked, "What have you asked me that I haven't answered?" – to which Mr. Logan did not respond.

77. ODFL employees and management frequently engage in casual, non-work-related conversations during their downtime or between tasks. That same day, Mr. Logan and other employees were having a conversation about NFL football and politics in the workplace.

78. Ms. McCathern reported Mr. Logan's hypocrisy to Mr. Hausman, who laughed at the situation and brushed her report off entirely.

79. The following week, Monday, December 23, 2024, Ms. McCathern emailed Mr. Hausman, Ms. Green, and Mr. Loveless regarding the ongoing issues that had been affecting her ability to perform her job and creating a hostile work environment. Therein, she reported the recently formulated allegations by Mr. Logan, which evidenced her less favorable treatment by him as detailed above. She further expressed her frustration with the failure

Package : 000016 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

Package : 000016 of 000044

Package : 000017 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ckage : 000017 of 000044

to take steps to prevent this discriminatory behavior from continuing.

80. On Thursday, December 26, 2024, Mr. Loveless replied that Ms. Green would investigate and reach out if further information was needed from Ms. McCathern. The next day, December 27, 2024, Ms. Green replied and requested Ms. McCathern call when she was available – which she did and reported the more recent issues with Mr. Logan as stated above.

81. Ms. McCathern never heard back from Ms. Green regarding the investigation of her reports, and no steps were taken to protect Ms. McCathern from further unfair treatment.

82. On or around January 14, 2024, Ms. McCathern was called into Mr. Hausman's office along with Mr. Logan, and, present via telephone, Ms. Green. During the meeting, Mr. Hausman stated that Ms. McCathern has recently gone down a path of "poor job performance," and stated that her employment with ODFL was terminated.

83. Mr. Hausman then asked if Ms. McCathern had questions, and she asked, "What are the job duties that have not been met?" – to which Mr. Hausman stated, "The EPRs…performance reviews…we've done over the last two years…that's about it."

84. Ms. McCathern asked for that in writing, and a document indicating her separation from employment.

85. As Mr. Hausman was asking, "We're not obligated to give a document of anything, are we?" Ms. Green interrupted, "no…no, we don't. You'll get something from benefits showing separation of employment."

86. Ms. McCathern then asked what job duties she had not met recently – i.e., since their last discussion regarding the final EPR.

87. Mr. Hausman stated, "the mis-pickups, the driver conversations…"



88. In response, Ms. McCathern asked, "What driver conversations? I'm just needing clarification."

89. Mr. Hausman then stated, "the attitude…and just the overall attitude."

90. Ms. McCathern was surprised, as Mr. Hausman had never mentioned her attitude before. She asked, "What attitude?" and stated that Mr. Logan rolled his eyes at her just that morning when she walked in.

91. Mr. Hausman then shifted his reasoning and claimed that drivers were "complaining."

92. In reply, Ms. McCathern questioned why she was expected to be content with disrespect, hostility, and insubordination that she reported, and then is terminated when she stands up for herself in a way that ensures a respectful and professional work environment.

93. Ms. McCathern expressed her disappointment that she was being terminated for having an "attitude," yet nothing was done about the hostility and discrimination by Mr. Logan and Ms. Bolyard.

94. Ms. Green claimed that all of Ms. McCathern's reports were investigated by her and Mr. Loveless.

95. Ms. McCathern then asked what the investigation revealed, to which Ms. Green said they could not corroborate Ms. McCathern's reports.

96. Ms. McCathern then thanked them for the opportunity, gathered her belongings, and exited the premises.

97. It soon became apparent to Ms. McCathern that her reports were not adequately investigated.

98. Ms. McCathern knew that Anthony Parker, a dock worker, had previously reported to HR that he was uncomfortable with the way Ms. McCathern was treated by both Mr. Logan

Package : 000018 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

Package : 000018 of 000044

and Ms. Bolyard. The dock was connected to Ms. McCathern's office, allowing Mr. Parker

to observe many of the above-described incidents. Yet, Ms. Green inaccurately reported

that no other employee substantiated her reports.

## CAUSES OF ACTION[1]

### *I. Violation of the Kentucky Civil Rights Act, KRS § 344.040, Race Discrimination*

99.     Plaintiff incorporates by reference each and every allegation contained in the proceeding

paragraphs as if fully set forth with particularity herein.

100.    KRS § 344.040(1)(a) prohibits discrimination on the basis of race in employment.

101.    Plaintiff is Black and, therefore, is a member of a racial minority.

102.    Defendant ODFL had the intent to discriminate against Plaintiff in her employment with

the Defendant based on the fact that she was Black.

103.    Plaintiff was treated less favorably than similarly situated white co-workers by Defendants

due to her race.

104.    Plaintiff was subjected to adverse employment actions, including her termination by

Defendant due to her race.

105.    Defendant's actions were intentional, willful, and in reckless disregard of Plaintiff's rights

as protected by the Kentucky Civil Rights Act, KRS § 344.040.

### *II. Violation of Kentucky Civil Rights Act, KRS § 344.280, Retaliation for Reporting Racial Harassment and Discrimination*

106.    Plaintiff incorporates by reference each and every allegation contained in the proceeding

paragraphs as if fully set forth with particularity herein.

107.    Plaintiff engaged in protected activity under the Kentucky Civil Rights Act by making

---

[1] For purposes of clarity, Causes of Action I, III, IV, and V are alleged against Defendant ODFL only. Cause of Action II is alleged against both ODFL and Hausman.

Package : 000019 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ckage : 000019 of 000044



reporting instances of racial harassment and discrimination.

108. Plaintiff was subjected to adverse actions by Defendants because she engaged in activity protected under the KCRA including, but not limited to the termination of her employment.

109. A reasonable employee in Plaintiff's position would have found Defendants' actions materially adverse.

110. There exists a causal connection between Defendants' materially adverse actions toward Plaintiff and her protected activity.

111. Defendants' asserted reasons for firing Plaintiff were pretextual and false.

112. Defendants' conduct violated the KCRA's anti-retaliation provision found in KRS 344.280.

113. As a direct and proximate result of Defendants' actions described herein, Plaintiff has suffered from a loss of income and benefits, emotional stress, and depression, for all of which she should be compensated.

114. Plaintiff is entitled to all relief, legal and equitable, available under the KCRA.

### III. Violation of KRS 337.285 - Failure to Pay Required Overtime

115. Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

116. Pursuant to KRS 337.010(1)(d), Defendant ODFL is an "employer" as that term is used within the context of the Kentucky Wages and Hours Act.

117. Pursuant to KRS 337.010(1)(e), Plaintiff was an "employee" of Defendant ODFL as that term is used within the context of the Kentucky Wages and Hours Act.

118. Plaintiff was required to perform significant work as a night-shift clerk. The night-shift

clerk positions is not excluded from the definition of "employee" under any provision of KRS 337.010(2)(a) and is not exempt from overtime pay requirements.

119. Plaintiff routinely worked in excess of 40 hours per week for Defendant. Plaintiff often worked at least 55-60 hours per week.

120. During the course of Plaintiff's employment, Defendant violated KRS 337.285 by failing to compensate Plaintiff at a rate of one and one-half times her regular rate of pay for hours worked in excess of forty per week.

121. Defendant never paid Plaintiff at a rate of one and one-half times her regular rate of pay for hours worked in excess of forty per week.

122. Defendant made no good-faith effort to comply with the KWHA with respect to the compensation of Plaintiff, but rather willfully, knowingly, and/or recklessly violated the KWHA and its corresponding state regulations by failing to properly compensate Plaintiff with overtime wages in accordance with KRS 337.285.

123. As a direct result of Defendant's violations of the KWHA, Plaintiff has been deprived of her rightful overtime compensation in an amount to be determined at trial, and is entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to KRS 337.385.

### *IV. Violation of KRS 337.355*

124. Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

125. KRS 337.355 requires employers grant their employees a reasonable period for lunch as close in time as possible to the middle of an employee's shift.

126. Pursuant to KRS 337.010(1)(d), Defendant ODFL is an "employer" as that term is used

Package : 000021 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000021 of 000044



within the context of the Kentucky Wages and Hours Act.

127. Pursuant to KRS 337.010(1)(e), Plaintiff was an "employee" of Defendant ODFL as that term is used within the context of the Kentucky Wages and Hours Act.

128. Defendant routinely denied lunch periods to Plaintiff throughout the course of her employment with Defendant.

129. By denying Plaintiff a reasonable period for lunch, Defendant violated the mandatory provisions of KRS 337.355.

130. KRS 446.070 permits a person injured by the violation of any Kentucky statute to recover from the perpetrator such damages as she sustained by reason of the violation.

131. As a result of Defendant's statutory violations, Plaintiff was made to suffer emotional and mental distress for which she should recover substantial damages from Defendant.

### V. Violation of KRS 337.365

132. Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

133. KRS 337.365 states, "[n]o employer shall require any employee to work without a rest period of at least ten (10) minutes during each four (4) hours worked...This shall be in addition to the regularly scheduled lunch period…"

134. Pursuant to KRS 337.010(1)(d), Defendant ODFL is an "employer" as that term is used within the context of the Kentucky Wages and Hours Act.

135. Pursuant to KRS 337.010(1)(e), Plaintiff was an "employee" of Defendant ODFL as that term is used within the context of the Kentucky Wages and Hours Act.

136. Defendant routinely denied rest periods to Plaintiff throughout the course of her employment with defendant.

Package : 000044    Presiding Judge: HON. JESSICA E. GREEN (630423)    Package : 000022 of 000044    Package : 000022 of 000044

137. By denying Plaintiff rest periods during the course of her employment, Defendant violated the mandatory provisions of KRS 337.365.

138. KRS 446.070 permits a person injured by the violation of any Kentucky statute to recover from the perpetrator such damages as she sustained by reason of the violation.

139. As a result of Defendant's statutory violations, Plaintiff was made to suffer emotional and mental distress for which she should recover substantial damages from Defendant.

## **PRAYER FOR RELIEF**

140. As a direct and proximate result of Defendants' wrongful acts toward her, Plaintiff has been denied wages and benefits of employment, for which she should recover substantial, actual, and compensatory damages from Defendant.

141. As a direct and proximate result of the Defendants' wrongful acts toward her, Plaintiff has suffered from emotional distress and mental anxiety, for all of which she should be compensated.

142. WHEREFORE, Plaintiff prays that this Court:

    a.   Declare Defendants' conduct to be in violation of Plaintiff's rights;

    b.   Award Plaintiff damages she sustained by reason of Defendants' wrongful acts, in an amount to be proven at trial, including, but not limited to, any and all compensatory and consequential damages suffered;

    c.   Award Plaintiff an amount to be proven at trial for the humiliation, embarrassment, personal indignity, apprehension about past, current and future well-being, emotional distress, and mental anguish which have been caused to her by the Defendants' wrongful acts;

    d.   Award Plaintiff any and all equitable relief to which she is entitled, including reinstatement;

    e.   Award Plaintiff pre- and post-judgment statutory interest;

    f.   Liquidated damages pursuant to KRS 337.385

Package : 000023 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000023 of 000044



g.  Award Plaintiff interest, costs, and attorneys' fees pursuant to KRS 344.450 and KRS 337.385; and,

h.  Grant Plaintiff such further relief as this Court may deem just and proper.

## JURY DEMAND

143.  Plaintiff demands a jury to try all issues triable by jury.

Respectfully Submitted,

*s/ P. Stewart Abney*
P. Stewart Abney
**ABNEY LAW OFFICE, PLLC**
1000 Cherokee Road
Suite Seven
Louisville, Kentucky 40204
T: (502) 498-8585
E: stewart@abneylegal.com
*Counsel for Plaintiff*

Package : 000024 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

Package : 000024 of 000044

CASE NUMBER _____

COMMONWEALTH OF KENTUCKY
JEFFERSON CIRCUIT COURT
DIVISION ___

*Electronically Filed*

DYMOND MCCATHERN                                          PLAINTIFF

v.

OLD DOMINION FREIGHT LINE, INC.                          DEFENDANT
1400 SOUTH LOUIS COLEMAN JR. DRIVE
LOUISVILLE, KENTUCKY 40211

      SERVE:     C T Corporation System
                       306 West Main Street
                       Suite 512
                       Frankfort, Kentucky 40601

MIKE HAUSMAN                                              DEFENDANT
1400 SOUTH LOUIS COLEMAN JR. DRIVE
LOUISVILLE, KENTUCKY 40211

      SERVE:     Mike Hausman
                       1400 South Louis Coleman Jr. Drive
                       Louisville, Kentucky 40211

## **COMPLAINT**
*Trial by Jury Demanded*

      Comes now Plaintiff, Dymond McCathern ("Ms. McCathern" or "Plaintiff"), by and through her counsel, and for her Complaint against the Defendants, Old Dominion Freight Line, Inc. and Mike Hausman, (hereinafter "ODFL" or "Hausman" individually, or "Defendants" collectively). Ms. McCathern brings this action to remedy the Defendants' unlawful conduct and secure any and all relief necessary to restore her rights under Kentucky law and to compensate her for damages sustained. In accordance therewith, Plaintiff alleges as follows:

Package : 000025 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000025 of 000044



## PARTIES

1.  Ms. McCathern resides in Louisville, Kentucky. Ms. McCathern was an employee of ODFL from October 2022 to January 14, 2024.

2.  Defendant ODFL is a foreign corporation doing business in the Commonwealth of Kentucky. ODFL's principal place of business is 500 Old Dominion Way, Thomasville, North Carolina 27360. ODFL owns and operates a logistics facility in Louisville, Kentucky.

## JURISDICTION AND VENUE

3.  Plaintiff's causes of action are brought pursuant to the Kentucky Civil Rights Act ("KCRA"), KRS 344.040 and KRS 344.280.

4.  Jurisdiction is proper in the Jefferson Circuit Court pursuant to KRS § 23A.010(1).

5.  Venue in this action is proper in the Jefferson Circuit Court pursuant to KRS 452.460(1) because, *inter alia*, injury arising from these events was done to Plaintiff in Jefferson County.

## FACTUAL ALLEGATIONS

1.  In or around October 2022, ODFL hired Ms. McCathern as a Pickup and Delivery Supervisor.

2.  Her duties consisted largely of supervising and directing tasks to drivers, managing the dock, and completing any related paperwork.

3.  Ms. McCathern strove to maintain a productive and respectful work environment and took great pride in her work and the contributions she made to the company. She was very committed to her role and performed her job satisfactorily.

4.  In the latter half of 2024, Ms. McCathern began experiencing problems with the behavior

Package : 000026 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

Package : 000026 of 000044

of Leann Bolyard, a driver whom she supervised.

5.    Specifically, Ms. Bolyard's conduct in the workplace was in contravention of company policies and created a hostile work environment for Ms. McCathern and other ODFL employees.

6.    Ms. Bolyard made many sexual innuendos and displayed inappropriate behavior in the workplace.

7.    For example, on one occasion, Ms. Bolyard was in the office where Ms. McCathern was working and held an empty paper towel roll in front of a male co-worker and asked, "Can it fit in it?" – alluding to sexual conduct.

8.    On another occasion, Ms. Bolyard came into the office where Ms. McCathern was along with other employees and supervisors and observed a piece of gummy candy shaped like female breasts. Ms. McCathern then observed Ms. Bolyard looked at the candy and said, "Oh, I have these too," and proceeded to shake her breasts and buttocks. Ms. McCathern was made extremely uncomfortable by this.

9.    Shortly after that, Ms. Bolyard, incredibly, accused Ms. McCathern of having her "excommunicated" from her church – which was completely false.

10.    Ms. McCathern learned that Ms. Bolyard was "excommunicated" from her church because a churchgoer had learned of Ms. Bolyard shaking her breast and buttocks in front of her co-workers.

11.    Ms. McCathern assured Ms. Bolyard that she had nothing to do with that.

12.    Notably, Ms. Bolyard did not accuse the male co-worker who witnessed the incident, and just so happens to be a member of the same church.

13.    Nevertheless, Ms. Bolyard insisted that Ms. McCathern was responsible for the fallout with

Package : 000027 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000027 of 000044



her church, and stated, "If I lose my job, you better believe you're going to lose your job, too."

14. Ms. McCathern reported Ms. Bolyard's accusations to Human Resources, and the underlying incident, but Ms. Bolyard was never disciplined.

15. Ms. Bolyard treated Ms. McCathern with hostility and less favorably than her White co-workers.

16. For example, Ms. Bolyard frequently hung up the phone on Ms. McCathern when she was directing Ms. Bolyard to perform a task.

17. On the other hand, when Ms. Bolyard would call Ms. McCathern to complain or berate her in a disrespectful and profane manner, Ms. McCathern would likewise end the conversation. Ms. Bolyard would call back and threaten Ms. McCathern, making comments such as, but not limited to, "hang up on me one more time, and all hell will break loose."

18. Ms. Bolyard, on multiple occasions, would call Ms. McCathern racial slurs to ODFL drivers, including the N-word.

19. In particular, Ms. Bolyard would make these comments to John Schmitt, another driver, who was quite uncomfortable with her language.

20. Mr. Schmitt relayed Ms. Bolyard's comments to Ms. McCathern, stating that he believed she was racist and that he had already reported it to Human Resources and management.

21. Ms. McCathern had already dealt with racist attitudes from ODFL's drivers.

22. In August or September 2024, Ms. McCathern reported to Mike Hausman, ODFL Service Center Manager, and the Human Resources department that employees, specifically drivers, were making racially charged comments, including statements such as "Black

Lives Matter is bullshit to them," "That [BLM] only came about when Obama was in office," and "The reason Joe Biden is president is because we allow him to come to the Black neighborhoods and put these signs in our yard."

23. When Ms. McCathern conveyed these concerns to Mr. Housman, she felt deeply humiliated and was visibly emotional, to the point of tears.

24. The distress caused by the treatment she was experiencing from employees led her to leave work for the day.

25. After leaving, she contacted HR to explain why she had to leave and to request the use of her PTO due to the emotional toll of the situation.

26. During her conversation with Mr. Housman, another employee, Andrea Spencer, was present in the office. Although Ms. Spencer was not Ms. McCathern's supervisor, Mr. Housman said she had to be there as a witness. However, when Ms. McCathern later spoke with Mary in HR, she was informed that Ms. Spencer should not have been present during the meeting.

27. In addition to Ms. Bolyard's accusation that Ms. McCathern caused her to be "excommunicated" from church, Ms. Bolyard frequently made baseless accusations about Ms. McCathern to other employees.

28. On one occasion, Ms. Bolyard was spreading rumors in the workplace that Ms. McCathern favored Earl Civils, another driver, because "he was allowed to get more hours than everyone else." Not only was this untrue, but it created a negative perception of Ms. McCathern in the eyes of her subordinates.

29. Ms. McCathern was the only Black female in a supervisor position during the nightshift, and the only supervisor that Ms. Bolyard treated this way.

Package : 000029 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000029 of 000044



30.   At one point, Ms. Bolyard approached Ms. McCathern and began to ramble about how she is "not racist" – when Ms. McCathern had never made such an assertion to Ms. Bolyard before.

31.   The night-shift clerk was a high turnover position.

32.   The night-shift clerk position was an hourly position and was not exempt from overtime requirements.

33.   Management delegated night-shift clerk responsibilities to Ms. McCathern without additional pay or equal distribution among other supervisors. Ms. McCathern was not the lowest seniority supervisor, and there was no other reason why Ms. McCathern was required to perform another position's duties in addition to her own.

34.   The clerk's responsibilities consisted of billing, data entry, scanning, and hazmat paperwork, among other clerical duties.

35.   This frequently resulted in Ms. McCathern working hours past her shift – which she did not have the option to accept or decline.

36.   Mark Logan, the Assistant Manager at this ODFL location, frequently made deeply offensive and racially charged remarks, in the presence of Black employees – including Ms. McCathern.

37.   Specifically, Mr. Logan said that he "shot a monkey." When Ms. McCathern questioned what he meant, Mr. Logan would simply repeat, "I've shot a monkey."

38.   Additionally, Mr. Logan made a point to inform Ms. McCathern that he resides on a "slave cemetery."

39.   On or around September 30, 2024, Mr. Logan issued Ms. McCathern a "final" Employee Performance Review ("EPR") and falsely claimed MS. McCathern had been insubordinate.

Package : 000030 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

Package : 000030 of 000044

40. The night that was the subject of the EPR was quite busy, and Ms. McCathern had been working for twelve hours without a lunch break – performing both her supervisory duties and the clerk's responsibilities.

41. Mr. Logan was also working that night. While he is the Assistant Manager, he tends to micromanage the supervisors – including Ms. McCathern – attempting to interfere with their independent judgment and performance of their positional responsibilities, rather than guiding their decision-making and performance.

42. This night in particular, Mr. Logan was frustrated with how busy the supervisors were. Mr. Logan wanted a trailer door moved, but Ms. McCathern had already asked the driver to move some trailers on their side because other drivers were outside waiting for a place to put their trailers.

43. For as long as Ms. McCathern worked at ODFL, it had always been protocol to maneuver the trailers in this manner during busy times.

44. When she explained this to Mr. Logan, he became angry and stated that he had previously directed Ms. McCathern to order drivers to pull to his side first.

45. Ms. McCathern questioned this logic, as they need both sides cleared regardless. She further explained that she did not tell the drivers what side to do first but merely asked them to move the trailers.

46. Mr. Logan raised his voice, stating, "Well, you need to listen to me! You do understand that I am your boss." Ms. McCathern replied, "I understand that. Do you want to go into the office to talk about it?"

47. Several employees surrounded Mr. Logan and Ms. McCathern as this conversation unfolded.

Package : 000031 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000031 of 000044



48.    Mr. Logan refused to speak privately, and stated, "We don't have to go in there and talk about it. I'll talk to you about it tomorrow."

49.    Ms. McCathern offered to go into the office because she began to feel severely humiliated as she was disrespected and yelled at by Mr. Logan in a room full of her co-workers and subordinates.

50.    As the night progressed, Mr. Logan became more and more agitated at the idea of not getting his way. Eventually, Mr. Logan began yelling, using profanity, and threw his clipboard on the ground and his pencil at the wall. Ms. McCathern was doing her job while watching it all unfold and became very uncomfortable and scared.

51.    About two hours past the end of Ms. McCathern's scheduled shift, she finally finished all her supervisory duties and the assigned clerical work. She then walked out of the office and past Mr. Logan, telling him to have a good night.

52.    Mr. Logan questioned, "Where do you think you're going?" to which Ms. McCathern said she was going home. Mr. Logan said nothing in response and left.

53.    Ms. McCathern gathered her things and began walking out, when Mr. Logan followed behind and asked again, "Where are you going?" to which Ms. McCathern repeated that she was going home and asked if there was something else he needed or if he needed her to stay. Mr. Logan then rolled his eyes at her, turned around, and went back into the office.

54.    Ms. McCathern was confused and didn't know why Mr. Logan was acting this way, but she had already performed her responsibilities for the night and left around one to two hours after the conclusion of her scheduled shift.. About 15 minutes later, Ms. McCathern received a call from Mr. Logan, asking, "Did you leave?" to which she said "Yes, I am on my way home." Mr. Logan said, "I told you not to leave," to which Ms. McCathern

reminded him that she had specifically asked whether he needed her to stay, and he said nothing.

55. On or about October 2, 2024, Ms. McCathern reported Mr. Logan's behavior to Mike Hausman, ODFL Service Center Manager, who thanked her for informing him of the matter, and stated he would speak with Mr. Logan because he should not be behaving in that manner.

56. Mr. Hausman then began to excuse Mr. Logan's hostility and aggression in the workplace because "he is military," and every person has their own "management style." Ms. McCathern did not accept this excuse, and expressed that, regardless of his military status, his behavior is inexcusable in the workplace.

57. On or about Friday, October 4, 2024, Ms. McCathern emailed Mary Green, HR Area Manager, and Ernest Loveless, HR Development Regional Manager, requesting a call to report Ms. Bolyard's actions.

58. Shortly thereafter, Ms. Green called Ms. McCathern, where she reported that Ms. Bolyard called her the N-word in multiple conversations with other employees in the workplace, which created a hostile work environment for her and other employees.

59. Ms. McCathern further reported Ms. Bolyard's insubordination, disrespect, threats, and unsubstantiated accusations as detailed above. Despite a corroborating report from Mr. Schmitt, Ms. Bolyard was never disciplined for her behavior.

60. There are no HR personnel on-site at ODFL's Louisville location. The closest HR is located in Indianapolis, IN – where Mr. Loveless and Ms. Green are located, and who are the point of contact for employees at the ODFL location Louisville, KY. Michael Ferrell is the Regional HR & Development Manager and supervises Mr. Loveless and Ms. Green.

Package : 000033 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

Package : 000033 of 000044



61. On Friday, October 11, 2024, around 8:00 PM, Ms. McCathern emailed multiple individuals within the HR Department, including Mr. Loveless, Ms. Green, James Siefert, Matthew Rimi, and DeeDee Cox, the HR Department Vice President, and attached a letter outlining her complaint, and all of the above-incidents of discrimination and harassment she had experienced at the hands of management and subordinates at ODFL in the previous several months.

62. Ms. McCathern outlined what actually transpired on September 30, 2024, as opposed to Mr. Logan's inaccurate account of events.

63. She informed HR that surveillance footage and other employees can corroborate her story. Ms. McCathern further questioned the issuance of a "final" EPR, considering that she had no recent write ups related to job performance or other similar incidents.

64. Only 11 minutes later, Ms. Cox replied that, since it appeared Ms. McCathern had already spoken with Mr. Loveless and Ms. Green, that she would have Jerry McGlown reach out to her, and that he reports directly to Ms. Cox. Mr. McGlown never contacted Ms. McCathern.

65. That same night, October 11, 2024, at 11:17 PM, Mr. Hausman issued Ms. McCathern a "final" write up for "overall poor job performance" based on Mr. Logan's version of events as set forth in her EPR.

66. Mr. Logan alleged that Ms. McCathern was given "a task to make sure the next driver to the window pulled some loaded trailers and replaced them with empties so we could continue to load freight. This was noticed about 30 min later and [Mr. Logan] questioned [Ms. McCathern] about it and she changed the plan, therefore, failing to execute the task that was given at the time."

Package : 000034 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

Package : 000034 of 000044

67.   It continued to read that, around 10:30 PM. Mr. Logan asked Ms. McCathern:

> [H]ow many drivers were still out? [Ms. McCathern] said she still
> had Harry [driver] to come back and process, [Mr. Logan] ask[ed]
> her to stay until Harry (*sic*) arrived back (*sic*) and the work was
> completed. [Mr. Logan] came back from the dock 15 min later and
> [Ms. McCathern] was gone. [Mr. Logan] called her and she said that
> Harry was the last of the drivers and that she had left. This was once
> again the failure to follow and execute a task given.

68.   On Thursday, October 17, 2024, Mr. Ferrell emailed Ms. McCathern, requesting she call

him the following day – which she did. After getting off the phone with Mr. Ferrell, Ms.

McCathern emailed him a summary of their phone conversation. Therein, Mr. Ferrell

informed Ms. McCathern that employees were interviewed and none of them substantiated

her report that Mr. Logan was screaming, cursing, and throwing objects in the workplace.

69.   However, Ms. McCathern previously provided HR with a timeframe of when the acts

occurred to confirm on the surveillance footage. Mr. Ferrell further confirmed that HR did

not investigate the video surveillance regarding object-throwing because of the "timing of

the reported behavior," but Ms. McCathern reported the incident two days after it occurred

– with plenty of time to obtain and review the relevant footage.

70.   Mr. Ferrell further indicated that Ms. McCathern's EPR was submitted prior to her report

of discrimination and hostile work environment, however, Ms. McCathern had made

multiple reports prior to the incident on September 30, 2024.

71.   He further stated that any further reports she made would be forwarded to Mr. Loveless,

and Ms. McCathern reminded Mr. Ferrell that she had yet to receive clarification on the

allegations prompting her final EPR from HR.

72.   On or around the week of December 16, 2024, ODFL management brought in a new

employee and ordered Ms. McCathern to train them without providing her prior notice.



Filed Case 3:25-cv-26-27-0b23b9-Cld4/13/2026 sument 1-1 David L. Nicholson, Jefferson 37rnd86 CleageID
#: 43

Package : 000036 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

Package : 000036 of 000044

Ms. McCathern explained that this was not communicated to her and would require her to work overtime.

73. None of Ms. McCathern's White counterparts were required to work overtime, and Ms. McCathern was frequently held past her shift to perform duties outside of her job description.

74. Nonetheless, Ms. McCathern did as ordered and trained the employee that night. Ms. McCathern and the trainee engaged in a casual conversation during downtime and in-between tasks.

75. At one point during the night while Ms. McCathern and the trainee were loading, Mr. Logan stated, "Is anybody listening to me? I've been talking to y'all, asking y'all questions, and y'all been ignoring me...Y'all been talking about everything else, but work."

76. Ms. McCathern and the trainee looked at one another, confused, and Ms. McCathern asked, "What have you asked me that I haven't answered?" – to which Mr. Logan did not respond.

77. ODFL employees and management frequently engage in casual, non-work-related conversations during their downtime or between tasks. That same day, Mr. Logan and other employees were having a conversation about NFL football and politics in the workplace.

78. Ms. McCathern reported Mr. Logan's hypocrisy to Mr. Hausman, who laughed at the situation and brushed her report off entirely.

79. The following week, Monday, December 23, 2024, Ms. McCathern emailed Mr. Hausman, Ms. Green, and Mr. Loveless regarding the ongoing issues that had been affecting her ability to perform her job and creating a hostile work environment. Therein, she reported the recently formulated allegations by Mr. Logan, which evidenced her less favorable treatment by him as detailed above. She further expressed her frustration with the failure

to take steps to prevent this discriminatory behavior from continuing.

80. On Thursday, December 26, 2024, Mr. Loveless replied that Ms. Green would investigate and reach out if further information was needed from Ms. McCathern. The next day, December 27, 2024, Ms. Green replied and requested Ms. McCathern call when she was available – which she did and reported the more recent issues with Mr. Logan as stated above.

81. Ms. McCathern never heard back from Ms. Green regarding the investigation of her reports, and no steps were taken to protect Ms. McCathern from further unfair treatment.

82. On or around January 14, 2024, Ms. McCathern was called into Mr. Hausman's office along with Mr. Logan, and, present via telephone, Ms. Green. During the meeting, Mr. Hausman stated that Ms. McCathern has recently gone down a path of "poor job performance," and stated that her employment with ODFL was terminated.

83. Mr. Hausman then asked if Ms. McCathern had questions, and she asked, "What are the job duties that have not been met?" – to which Mr. Hausman stated, "The EPRs...performance reviews...we've done over the last two years...that's about it."

84. Ms. McCathern asked for that in writing, and a document indicating her separation from employment.

85. As Mr. Hausman was asking, "We're not obligated to give a document of anything, are we?" Ms. Green interrupted, "no...no, we don't. You'll get something from benefits showing separation of employment."

86. Ms. McCathern then asked what job duties she had not met recently – i.e., since their last discussion regarding the final EPR.

87. Mr. Hausman stated, "the mis-pickups, the driver conversations..."



Package : 000037 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000037 of 000044

88. In response, Ms. McCathern asked, "What driver conversations? I'm just needing clarification."

89. Mr. Hausman then stated, "the attitude…and just the overall attitude."

90. Ms. McCathern was surprised, as Mr. Hausman had never mentioned her attitude before. She asked, "What attitude?" and stated that Mr. Logan rolled his eyes at her just that morning when she walked in.

91. Mr. Hausman then shifted his reasoning and claimed that drivers were "complaining."

92. In reply, Ms. McCathern questioned why she was expected to be content with disrespect, hostility, and insubordination that she reported, and then is terminated when she stands up for herself in a way that ensures a respectful and professional work environment.

93. Ms. McCathern expressed her disappointment that she was being terminated for having an "attitude," yet nothing was done about the hostility and discrimination by Mr. Logan and Ms. Bolyard.

94. Ms. Green claimed that all of Ms. McCathern's reports were investigated by her and Mr. Loveless.

95. Ms. McCathern then asked what the investigation revealed, to which Ms. Green said they could not corroborate Ms. McCathern's reports.

96. Ms. McCathern then thanked them for the opportunity, gathered her belongings, and exited the premises.

97. It soon became apparent to Ms. McCathern that her reports were not adequately investigated.

98. Ms. McCathern knew that Anthony Parker, a dock worker, had previously reported to HR that he was uncomfortable with the way Ms. McCathern was treated by both Mr. Logan

and Ms. Bolyard. The dock was connected to Ms. McCathern's office, allowing Mr. Parker

to observe many of the above-described incidents. Yet, Ms. Green inaccurately reported

that no other employee substantiated her reports.

### CAUSES OF ACTION[1]

#### I. Violation of the Kentucky Civil Rights Act, KRS § 344.040, Race Discrimination

99.    Plaintiff incorporates by reference each and every allegation contained in the proceeding

paragraphs as if fully set forth with particularity herein.

100.    KRS § 344.040(1)(a) prohibits discrimination on the basis of race in employment.

101.    Plaintiff is Black and, therefore, is a member of a racial minority.

102.    Defendant ODFL had the intent to discriminate against Plaintiff in her employment with

the Defendant based on the fact that she was Black.

103.    Plaintiff was treated less favorably than similarly situated white co-workers by Defendants

due to her race.

104.    Plaintiff was subjected to adverse employment actions, including her termination by

Defendant due to her race.

105.    Defendant's actions were intentional, willful, and in reckless disregard of Plaintiff's rights

as protected by the Kentucky Civil Rights Act, KRS § 344.040.

#### II. Violation of Kentucky Civil Rights Act, KRS § 344.280, Retaliation for Reporting Racial Harassment and Discrimination

106.    Plaintiff incorporates by reference each and every allegation contained in the proceeding

paragraphs as if fully set forth with particularity herein.

107.    Plaintiff engaged in protected activity under the Kentucky Civil Rights Act by making

---

[1] For purposes of clarity, Causes of Action I, III, IV, and V are alleged against Defendant ODFL only. Cause
of Action II is alleged against both ODFL and Hausman.

Package : 000039 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000039 of 000044



reporting instances of racial harassment and discrimination.

108. Plaintiff was subjected to adverse actions by Defendants because she engaged in activity protected under the KCRA including, but not limited to the termination of her employment.

109. A reasonable employee in Plaintiff's position would have found Defendants' actions materially adverse.

110. There exists a causal connection between Defendants' materially adverse actions toward Plaintiff and her protected activity.

111. Defendants' asserted reasons for firing Plaintiff were pretextual and false.

112. Defendants' conduct violated the KCRA's anti-retaliation provision found in KRS 344.280.

113. As a direct and proximate result of Defendants' actions described herein, Plaintiff has suffered from a loss of income and benefits, emotional stress, and depression, for all of which she should be compensated.

114. Plaintiff is entitled to all relief, legal and equitable, available under the KCRA.

### III. Violation of KRS 337.285 - Failure to Pay Required Overtime

115. Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

116. Pursuant to KRS 337.010(1)(d), Defendant ODFL is an "employer" as that term is used within the context of the Kentucky Wages and Hours Act.

117. Pursuant to KRS 337.010(1)(e), Plaintiff was an "employee" of Defendant ODFL as that term is used within the context of the Kentucky Wages and Hours Act.

118. Plaintiff was required to perform significant work as a night-shift clerk. The night-shift

Package : 000040 of 000044     Presiding Judge: HON. JESSICA E. GREEN (630423)     Package : 000040 of 000044

clerk positions is not excluded from the definition of "employee" under any provision of KRS 337.010(2)(a) and is not exempt from overtime pay requirements.

119. Plaintiff routinely worked in excess of 40 hours per week for Defendant. Plaintiff often worked at least 55-60 hours per week.

120. During the course of Plaintiff's employment, Defendant violated KRS 337.285 by failing to compensate Plaintiff at a rate of one and one-half times her regular rate of pay for hours worked in excess of forty per week.

121. Defendant never paid Plaintiff at a rate of one and one-half times her regular rate of pay for hours worked in excess of forty per week.

122. Defendant made no good-faith effort to comply with the KWHA with respect to the compensation of Plaintiff, but rather willfully, knowingly, and/or recklessly violated the KWHA and its corresponding state regulations by failing to properly compensate Plaintiff with overtime wages in accordance with KRS 337.285.

123. As a direct result of Defendant's violations of the KWHA, Plaintiff has been deprived of her rightful overtime compensation in an amount to be determined at trial, and is entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to KRS 337.385.

### IV. Violation of KRS 337.355

124. Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

125. KRS 337.355 requires employers grant their employees a reasonable period for lunch as close in time as possible to the middle of an employee's shift.

126. Pursuant to KRS 337.010(1)(d), Defendant ODFL is an "employer" as that term is used



within the context of the Kentucky Wages and Hours Act.

127. Pursuant to KRS 337.010(1)(e), Plaintiff was an "employee" of Defendant ODFL as that term is used within the context of the Kentucky Wages and Hours Act.

128. Defendant routinely denied lunch periods to Plaintiff throughout the course of her employment with Defendant.

129. By denying Plaintiff a reasonable period for lunch, Defendant violated the mandatory provisions of KRS 337.355.

130. KRS 446.070 permits a person injured by the violation of any Kentucky statute to recover from the perpetrator such damages as she sustained by reason of the violation.

131. As a result of Defendant's statutory violations, Plaintiff was made to suffer emotional and mental distress for which she should recover substantial damages from Defendant.

### *V. Violation of KRS 337.365*

132. Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

133. KRS 337.365 states, "[n]o employer shall require any employee to work without a rest period of at least ten (10) minutes during each four (4) hours worked...This shall be in addition to the regularly scheduled lunch period…"

134. Pursuant to KRS 337.010(1)(d), Defendant ODFL is an "employer" as that term is used within the context of the Kentucky Wages and Hours Act.

135. Pursuant to KRS 337.010(1)(e), Plaintiff was an "employee" of Defendant ODFL as that term is used within the context of the Kentucky Wages and Hours Act.

136. Defendant routinely denied rest periods to Plaintiff throughout the course of her employment with defendant.

137.  By denying Plaintiff rest periods during the course of her employment, Defendant violated the mandatory provisions of KRS 337.365.

138.  KRS 446.070 permits a person injured by the violation of any Kentucky statute to recover from the perpetrator such damages as she sustained by reason of the violation.

139.  As a result of Defendant's statutory violations, Plaintiff was made to suffer emotional and mental distress for which she should recover substantial damages from Defendant.

**PRAYER FOR RELIEF**

140.  As a direct and proximate result of Defendants' wrongful acts toward her, Plaintiff has been denied wages and benefits of employment, for which she should recover substantial, actual, and compensatory damages from Defendant.

141.  As a direct and proximate result of the Defendants' wrongful acts toward her, Plaintiff has suffered from emotional distress and mental anxiety, for all of which she should be compensated.

142.  WHEREFORE, Plaintiff prays that this Court:

    a.  Declare Defendants' conduct to be in violation of Plaintiff's rights;

    b.  Award Plaintiff damages she sustained by reason of Defendants' wrongful acts, in an amount to be proven at trial, including, but not limited to, any and all compensatory and consequential damages suffered;

    c.  Award Plaintiff an amount to be proven at trial for the humiliation, embarrassment, personal indignity, apprehension about past, current and future well-being, emotional distress, and mental anguish which have been caused to her by the Defendants' wrongful acts;

    d.  Award Plaintiff any and all equitable relief to which she is entitled, including reinstatement;

    e.  Award Plaintiff pre- and post-judgment statutory interest;

    f.   Liquidated damages pursuant to KRS 337.385

Package : 000044 of 000044

Presiding Judge: HON. JESSICA E. GREEN (630423)

ackage : 000043 of 000044



g.    Award Plaintiff interest, costs, and attorneys' fees pursuant to KRS 344.450 and KRS 337.385; and,

h.    Grant Plaintiff such further relief as this Court may deem just and proper.

## JURY DEMAND

143.    Plaintiff demands a jury to try all issues triable by jury.

Respectfully Submitted,

*s/ P. Stewart Abney*
P. Stewart Abney
**ABNEY LAW OFFICE, PLLC**
1000 Cherokee Road
Suite Seven
Louisville, Kentucky 40204
T: (502) 498-8585
E: stewart@abneylegal.com
*Counsel for Plaintiff*

| AOC-E-105    Sum Code: CI<br>Rev. 9-14<br><br>Commonwealth of Kentucky<br>Court of Justice    *Courts.ky.gov*<br><br>CR 4.02; Cr Official Form 1 | <br><br>**CIVIL SUMMONS** | Case #: **25-CI-002839**<br>Court: **CIRCUIT**<br>County: **JEFFERSON Circuit** |

package : 000003 of 000043

*Plantiff,* **MCCATHERN, DYMOND VS. OLD DOMINION FREIGHT LINE, INC. ET AL,** *Defendant*

TO:  **MIKE HAUSMAN**

    **1400 SOUTH LOUIS COLEMAN JR. DRIVE**

    **LOUISVILLE, KY 40211**

The Commonwealth of Kentucky to Defendant:

    You are hereby notified that a **legal action has been filed against you** in this Court demanding relief as shown on the document delivered to you with this Summons. **Unless a written defense is made by you or by an attorney on your behalf within twenty (20) days** following the day this paper is delivered to you, judgment by default may be taken against you for the relief demanded in the attached complaint.

The name(s) and address(es) of the party or parties demanding relief against you or his/her (their) attorney(s) are shown on the document delivered to you with this Summons.

                            *Davis L. Nicholson*

                            Jefferson Circuit Clerk
                            Date: **4/13/2025**

Presiding Judge: HON. JESSICA E. GREEN (630423)

---

### Proof of Service

This Summons was:

☐ Served by delivering a true copy and the Complaint (or other initiating document)

    To: _____

☐ Not Served because: _____

Date: _____, 20_____

                                   _____
                                   Served By

                                   _____
                                   Title

CI : 000001 of 000001



Page 1 of 1

**eFiled**

Filed                25-CI-002839     04/13/2025     David L. Nicholson, Jefferson Circuit Clerk

CASE NUMBER _____                              COMMONWEALTH OF KENTUCKY
                                                       JEFFERSON CIRCUIT COURT
                                                                DIVISION ___

*Electronically Filed*

DYMOND MCCATHERN                                                 PLAINTIFF

v.

OLD DOMINION FREIGHT LINE, INC.                                 DEFENDANT
1400 SOUTH LOUIS COLEMAN JR. DRIVE
LOUISVILLE, KENTUCKY  40211

        SERVE:     C T Corporation System
                 306 West Main Street
                 Suite 512
                 Frankfort, Kentucky 40601

MIKE HAUSMAN                                                    DEFENDANT
1400 SOUTH LOUIS COLEMAN JR. DRIVE
LOUISVILLE, KENTUCKY  40211

        SERVE:     Mike Hausman
                 1400 South Louis Coleman Jr. Drive
                 Louisville, Kentucky  40211

## COMPLAINT
*Trial by Jury Demanded*

Comes now Plaintiff, Dymond McCathern ("Ms. McCathern" or "Plaintiff"), by and

through her counsel, and for her Complaint against the Defendants, Old Dominion Freight Line,

Inc. and Mike Hausman, (hereinafter "ODFL" or "Hausman" individually, or "Defendants"

collectively).  Ms. McCathern brings this action to remedy the Defendants' unlawful conduct and

secure any and all relief necessary to restore her rights under Kentucky law and to compensate her

for damages sustained.  In accordance therewith, Plaintiff alleges as follows:

Filed        25-CI-002839    04/13/2025        David L. Nicholson, Jefferson Circuit Clerk

## PARTIES

1.   Ms. McCathern resides in Louisville, Kentucky.  Ms. McCathern was an employee of ODFL from October 2022 to January 14, 2024.

2.   Defendant ODFL is a foreign corporation doing business in the Commonwealth of Kentucky. ODFL's principal place of business is 500 Old Dominion Way, Thomasville, North Carolina 27360. ODFL owns and operates a logistics facility in Louisville, Kentucky.

## JURISDICTION AND VENUE

3.   Plaintiff's causes of action are brought pursuant to the Kentucky Civil Rights Act ("KCRA"), KRS 344.040 and KRS 344.280.

4.   Jurisdiction is proper in the Jefferson Circuit Court pursuant to KRS § 23A.010(1).

5.   Venue in this action is proper in the Jefferson Circuit Court pursuant to KRS 452.460(1) because, *inter alia*, injury arising from these events was done to Plaintiff in Jefferson County.

## FACTUAL ALLEGATIONS

1.   In or around October 2022, ODFL hired Ms. McCathern as a Pickup and Delivery Supervisor.

2.   Her duties consisted largely of supervising and directing tasks to drivers, managing the dock, and completing any related paperwork.

3.   Ms. McCathern strove to maintain a productive and respectful work environment and took great pride in her work and the contributions she made to the company. She was very committed to her role and performed her job satisfactorily.

4.   In the latter half of 2024, Ms. McCathern began experiencing problems with the behavior

package : 000005 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000002 of 000020

Filed          25-CI-002839    04/13/2025          David L. Nicholson, Jefferson Circuit Clerk

of Leann Bolyard, a driver whom she supervised.

5.    Specifically, Ms. Bolyard's conduct in the workplace was in contravention of company policies and created a hostile work environment for Ms. McCathern and other ODFL employees.

6.    Ms. Bolyard made many sexual innuendos and displayed inappropriate behavior in the workplace.

7.    For example, on one occasion, Ms. Bolyard was in the office where Ms. McCathern was working and held an empty paper towel roll in front of a male co-worker and asked, "Can it fit in it?" – alluding to sexual conduct.

8.    On another occasion, Ms. Bolyard came into the office where Ms. McCathern was along with other employees and supervisors and observed a piece of gummy candy shaped like female breasts. Ms. McCathern then observed Ms. Bolyard looked at the candy and said, "Oh, I have these too," and proceeded to shake her breasts and buttocks. Ms. McCathern was made extremely uncomfortable by this.

9.    Shortly after that, Ms. Bolyard, incredibly, accused Ms. McCathern of having her "excommunicated" from her church – which was completely false.

10.    Ms. McCathern learned that Ms. Bolyard was "excommunicated" from her church because a churchgoer had learned of Ms. Bolyard shaking her breast and buttocks in front of her co-workers.

11.    Ms. McCathern assured Ms. Bolyard that she had nothing to do with that.

12.    Notably, Ms. Bolyard did not accuse the male co-worker who witnessed the incident, and just so happens to be a member of the same church.

13.    Nevertheless, Ms. Bolyard insisted that Ms. McCathern was responsible for the fallout with

package : 000006 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000003 of 000020

Filed        25-CI-002839    04/13/2025        David L. Nicholson, Jefferson Circuit Clerk

her church, and stated, "If I lose my job, you better believe you're going to lose your job, too."

14. Ms. McCathern reported Ms. Bolyard's accusations to Human Resources, and the underlying incident, but Ms. Bolyard was never disciplined.

15. Ms. Bolyard treated Ms. McCathern with hostility and less favorably than her White co-workers.

16. For example, Ms. Bolyard frequently hung up the phone on Ms. McCathern when she was directing Ms. Bolyard to perform a task.

17. On the other hand, when Ms. Bolyard would call Ms. McCathern to complain or berate her in a disrespectful and profane manner, Ms. McCathern would likewise end the conversation. Ms. Bolyard would call back and threaten Ms. McCathern, making comments such as, but not limited to, "hang up on me one more time, and all hell will break loose."

18. Ms. Bolyard, on multiple occasions, would call Ms. McCathern racial slurs to ODFL drivers, including the N-word.

19. In particular, Ms. Bolyard would make these comments to John Schmitt, another driver, who was quite uncomfortable with her language.

20. Mr. Schmitt relayed Ms. Bolyard's comments to Ms. McCathern, stating that he believed she was racist and that he had already reported it to Human Resources and management.

21. Ms. McCathern had already dealt with racist attitudes from ODFL's drivers.

22. In August or September 2024, Ms. McCathern reported to Mike Hausman, ODFL Service Center Manager, and the Human Resources department that employees, specifically drivers, were making racially charged comments, including statements such as "Black

Filed        25-CI-002839    04/13/2025        David L. Nicholson, Jefferson Circuit Clerk    4

package : 000007 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000004 of 000020

Lives Matter is bullshit to them," "That [BLM] only came about when Obama was in office," and "The reason Joe Biden is president is because we allow him to come to the Black neighborhoods and put these signs in our yard."

23. When Ms. McCathern conveyed these concerns to Mr. Housman, she felt deeply humiliated and was visibly emotional, to the point of tears.

24. The distress caused by the treatment she was experiencing from employees led her to leave work for the day.

25. After leaving, she contacted HR to explain why she had to leave and to request the use of her PTO due to the emotional toll of the situation.

26. During her conversation with Mr. Housman, another employee, Andrea Spencer, was present in the office. Although Ms. Spencer was not Ms. McCathern's supervisor, Mr. Housman said she had to be there as a witness. However, when Ms. McCathern later spoke with Mary in HR, she was informed that Ms. Spencer should not have been present during the meeting.

27. In addition to Ms. Bolyard's accusation that Ms. McCathern caused her to be "excommunicated" from church, Ms. Bolyard frequently made baseless accusations about Ms. McCathern to other employees.

28. On one occasion, Ms. Bolyard was spreading rumors in the workplace that Ms. McCathern favored Earl Civils, another driver, because "he was allowed to get more hours than everyone else." Not only was this untrue, but it created a negative perception of Ms. McCathern in the eyes of her subordinates.

29. Ms. McCathern was the only Black female in a supervisor position during the nightshift, and the only supervisor that Ms. Bolyard treated this way.

package : 000008 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000005 of 000020

30.    At one point, Ms. Bolyard approached Ms. McCathern and began to ramble about how she is "not racist" – when Ms. McCathern had never made such an assertion to Ms. Bolyard before.

31.    The night-shift clerk was a high turnover position.

32.    The night-shift clerk position was an hourly position and was not exempt from overtime requirements.

33.    Management delegated night-shift clerk responsibilities to Ms. McCathern without additional pay or equal distribution among other supervisors. Ms. McCathern was not the lowest seniority supervisor, and there was no other reason why Ms. McCathern was required to perform another position's duties in addition to her own.

34.    The clerk's responsibilities consisted of billing, data entry, scanning, and hazmat paperwork, among other clerical duties.

35.    This frequently resulted in Ms. McCathern working hours past her shift – which she did not have the option to accept or decline.

36.    Mark Logan, the Assistant Manager at this ODFL location, frequently made deeply offensive and racially charged remarks, in the presence of Black employees – including Ms. McCathern.

37.    Specifically, Mr. Logan said that he "shot a monkey." When Ms. McCathern questioned what he meant, Mr. Logan would simply repeat, "I've shot a monkey."

38.    Additionally, Mr. Logan made a point to inform Ms. McCathern that he resides on a "slave cemetery."

39.    On or around September 30, 2024, Mr. Logan issued Ms. McCathern a "final" Employee Performance Review ("EPR") and falsely claimed MS. McCathern had been insubordinate.

package : 000009 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000006 of 000020

package : 000010 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000007 of 000020

40.   The night that was the subject of the EPR was quite busy, and Ms. McCathern had been working for twelve hours without a lunch break – performing both her supervisory duties and the clerk's responsibilities.

41.   Mr. Logan was also working that night. While he is the Assistant Manager, he tends to micromanage the supervisors – including Ms. McCathern – attempting to interfere with their independent judgment and performance of their positional responsibilities, rather than guiding their decision-making and performance.

42.   This night in particular, Mr. Logan was frustrated with how busy the supervisors were. Mr. Logan wanted a trailer door moved, but Ms. McCathern had already asked the driver to move some trailers on their side because other drivers were outside waiting for a place to put their trailers.

43.   For as long as Ms. McCathern worked at ODFL, it had always been protocol to maneuver the trailers in this manner during busy times.

44.   When she explained this to Mr. Logan, he became angry and stated that he had previously directed Ms. McCathern to order drivers to pull to his side first.

45.   Ms. McCathern questioned this logic, as they need both sides cleared regardless. She further explained that she did not tell the drivers what side to do first but merely asked them to move the trailers.

46.   Mr. Logan raised his voice, stating, "Well, you need to listen to me! You do understand that I am your boss." Ms. McCathern replied, "I understand that. Do you want to go into the office to talk about it?"

47.   Several employees surrounded Mr. Logan and Ms. McCathern as this conversation unfolded.

48.     Mr. Logan refused to speak privately, and stated, "We don't have to go in there and talk
        about it. I'll talk to you about it tomorrow."

49.     Ms. McCathern offered to go into the office because she began to feel severely humiliated
        as she was disrespected and yelled at by Mr. Logan in a room full of her co-workers and
        subordinates.

50.     As the night progressed, Mr. Logan became more and more agitated at the idea of not
        getting his way. Eventually, Mr. Logan began yelling, using profanity, and threw his
        clipboard on the ground and his pencil at the wall. Ms. McCathern was doing her job while
        watching it all unfold and became very uncomfortable and scared.

51.     About two hours past the end of Ms. McCathern's scheduled shift, she finally finished all
        her supervisory duties and the assigned clerical work. She then walked out of the office
        and past Mr. Logan, telling him to have a good night.

52.     Mr. Logan questioned, "Where do you think you're going?" to which Ms. McCathern said
        she was going home. Mr. Logan said nothing in response and left.

53.     Ms. McCathern gathered her things and began walking out, when Mr. Logan followed
        behind and asked again, "Where are you going?" to which Ms. McCathern repeated that
        she was going home and asked if there was something else he needed or if he needed her
        to stay. Mr. Logan then rolled his eyes at her, turned around, and went back into the office.

54.     Ms. McCathern was confused and didn't know why Mr. Logan was acting this way, but
        she had already performed her responsibilities for the night and left around one to two
        hours after the conclusion of her scheduled shift.. About 15 minutes later, Ms. McCathern
        received a call from Mr. Logan, asking, "Did you leave?" to which she said "Yes, I am on
        my way home." Mr. Logan said, "I told you not to leave," to which Ms. McCathern

package : 000011 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000008 of 000020

reminded him that she had specifically asked whether he needed her to stay, and he said nothing.

55.     On or about October 2, 2024, Ms. McCathern reported Mr. Logan's behavior to Mike Hausman, ODFL Service Center Manager, who thanked her for informing him of the matter, and stated he would speak with Mr. Logan because he should not be behaving in that manner.

56.     Mr. Hausman then began to excuse Mr. Logan's hostility and aggression in the workplace because "he is military," and every person has their own "management style." Ms. McCathern did not accept this excuse, and expressed that, regardless of his military status, his behavior is inexcusable in the workplace.

57.     On or about Friday, October 4, 2024, Ms. McCathern emailed Mary Green, HR Area Manager, and Ernest Loveless, HR Development Regional Manager, requesting a call to report Ms. Bolyard's actions.

58.     Shortly thereafter, Ms. Green called Ms. McCathern, where she reported that Ms. Bolyard called her the N-word in multiple conversations with other employees in the workplace, which created a hostile work environment for her and other employees.

59.     Ms. McCathern further reported Ms. Bolyard's insubordination, disrespect, threats, and unsubstantiated accusations as detailed above. Despite a corroborating report from Mr. Schmitt, Ms. Bolyard was never disciplined for her behavior.

60.     There are no HR personnel on-site at ODFL's Louisville location. The closest HR is located in Indianapolis, IN – where Mr. Loveless and Ms. Green are located, and who are the point of contact for employees at the ODFL location Louisville, KY. Michael Ferrell is the Regional HR & Development Manager and supervises Mr. Loveless and Ms. Green.

package : 000012 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000009 of 000020

61.  On Friday, October 11, 2024, around 8:00 PM, Ms. McCathern emailed multiple individuals within the HR Department, including Mr. Loveless, Ms. Green, James Siefert, Matthew Rimi, and DeeDee Cox, the HR Department Vice President, and attached a letter outlining her complaint, and all of the above-incidents of discrimination and harassment she had experienced at the hands of management and subordinates at ODFL in the previous several months.

62.  Ms. McCathern outlined what actually transpired on September 30, 2024, as opposed to Mr. Logan's inaccurate account of events.

63.  She informed HR that surveillance footage and other employees can corroborate her story. Ms. McCathern further questioned the issuance of a "final" EPR, considering that she had no recent write ups related to job performance or other similar incidents.

64.  Only 11 minutes later, Ms. Cox replied that, since it appeared Ms. McCathern had already spoken with Mr. Loveless and Ms. Green, that she would have Jerry McGlown reach out to her, and that he reports directly to Ms. Cox. Mr. McGlown never contacted Ms. McCathern.

65.  That same night, October 11, 2024, at 11:17 PM, Mr. Hausman issued Ms. McCathern a "final" write up for "overall poor job performance" based on Mr. Logan's version of events as set forth in her EPR.

66.  Mr. Logan alleged that Ms. McCathern was given "a task to make sure the next driver to the window pulled some loaded trailers and replaced them with empties so we could continue to load freight. This was noticed about 30 min later and [Mr. Logan] questioned [Ms. McCathern] about it and she changed the plan, therefore, failing to execute the task that was given at the time."

Filed        25-CI-002839    04/13/2025        David L. Nicholson, Jefferson Circuit Clerk

67.    It continued to read that, around 10:30 PM. Mr. Logan asked Ms. McCathern:

>       [H]ow many drivers were still out? [Ms. McCathern] said she still
>       had Harry [driver] to come back and process, [Mr. Logan] ask[ed]
>       her to stay until Harry (*sic*) arrived back (*sic*) and the work was
>       completed. [Mr. Logan] came back from the dock 15 min later and
>       [Ms. McCathern] was gone. [Mr. Logan] called her and she said that
>       Harry was the last of the drivers and that she had left. This was once
>       again the failure to follow and execute a task given.

68.    On Thursday, October 17, 2024, Mr. Ferrell emailed Ms. McCathern, requesting she call him the following day – which she did. After getting off the phone with Mr. Ferrell, Ms. McCathern emailed him a summary of their phone conversation. Therein, Mr. Ferrell informed Ms. McCathern that employees were interviewed and none of them substantiated her report that Mr. Logan was screaming, cursing, and throwing objects in the workplace.

69.    However, Ms. McCathern previously provided HR with a timeframe of when the acts occurred to confirm on the surveillance footage. Mr. Ferrell further confirmed that HR did not investigate the video surveillance regarding object-throwing because of the "timing of the reported behavior," but Ms. McCathern reported the incident two days after it occurred – with plenty of time to obtain and review the relevant footage.

70.    Mr. Ferrell further indicated that Ms. McCathern's EPR was submitted prior to her report of discrimination and hostile work environment, however, Ms. McCathern had made multiple reports prior to the incident on September 30, 2024.

71.    He further stated that any further reports she made would be forwarded to Mr. Loveless, and Ms. McCathern reminded Mr. Ferrell that she had yet to receive clarification on the allegations prompting her final EPR from HR.

72.    On or around the week of December 16, 2024, ODFL management brought in a new employee and ordered Ms. McCathern to train them without providing her prior notice.

Filed        25-CI-002839    04/13/2025        David L. Nicholson, Jefferson Circuit Clerk  11

package : 000014 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000011 of 000020

Ms. McCathern explained that this was not communicated to her and would require her to work overtime.

73.    None of Ms. McCathern's White counterparts were required to work overtime, and Ms. McCathern was frequently held past her shift to perform duties outside of her job description.

74.    Nonetheless, Ms. McCathern did as ordered and trained the employee that night. Ms. McCathern and the trainee engaged in a casual conversation during downtime and in-between tasks.

75.    At one point during the night while Ms. McCathern and the trainee were loading, Mr. Logan stated, "Is anybody listening to me? I've been talking to y'all, asking y'all questions, and y'all been ignoring me…Y'all been talking about everything else, but work."

76.    Ms. McCathern and the trainee looked at one another, confused, and Ms. McCathern asked, "What have you asked me that I haven't answered?" – to which Mr. Logan did not respond.

77.    ODFL employees and management frequently engage in casual, non-work-related conversations during their downtime or between tasks. That same day, Mr. Logan and other employees were having a conversation about NFL football and politics in the workplace.

78.    Ms. McCathern reported Mr. Logan's hypocrisy to Mr. Hausman, who laughed at the situation and brushed her report off entirely.

79.    The following week, Monday, December 23, 2024, Ms. McCathern emailed Mr. Hausman, Ms. Green, and Mr. Loveless regarding the ongoing issues that had been affecting her ability to perform her job and creating a hostile work environment. Therein, she reported the recently formulated allegations by Mr. Logan, which evidenced her less favorable treatment by him as detailed above. She further expressed her frustration with the failure

package : 000043 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000012 of 000020

to take steps to prevent this discriminatory behavior from continuing.

80. On Thursday, December 26, 2024, Mr. Loveless replied that Ms. Green would investigate and reach out if further information was needed from Ms. McCathern. The next day, December 27, 2024, Ms. Green replied and requested Ms. McCathern call when she was available – which she did and reported the more recent issues with Mr. Logan as stated above.

81. Ms. McCathern never heard back from Ms. Green regarding the investigation of her reports, and no steps were taken to protect Ms. McCathern from further unfair treatment.

82. On or around January 14, 2024, Ms. McCathern was called into Mr. Hausman's office along with Mr. Logan, and, present via telephone, Ms. Green. During the meeting, Mr. Hausman stated that Ms. McCathern has recently gone down a path of "poor job performance," and stated that her employment with ODFL was terminated.

83. Mr. Hausman then asked if Ms. McCathern had questions, and she asked, "What are the job duties that have not been met?" – to which Mr. Hausman stated, "The EPRs…performance reviews…we've done over the last two years…that's about it."

84. Ms. McCathern asked for that in writing, and a document indicating her separation from employment.

85. As Mr. Hausman was asking, "We're not obligated to give a document of anything, are we?" Ms. Green interrupted, "no…no, we don't. You'll get something from benefits showing separation of employment."

86. Ms. McCathern then asked what job duties she had not met recently – i.e., since their last discussion regarding the final EPR.

87. Mr. Hausman stated, "the mis-pickups, the driver conversations…"

package : 000016 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000013 of 000020

88.    In response, Ms. McCathern asked, "What driver conversations? I'm just needing clarification."

89.    Mr. Hausman then stated, "the attitude…and just the overall attitude."

90.    Ms. McCathern was surprised, as Mr. Hausman had never mentioned her attitude before. She asked, "What attitude?" and stated that Mr. Logan rolled his eyes at her just that morning when she walked in.

91.    Mr. Hausman then shifted his reasoning and claimed that drivers were "complaining."

92.    In reply, Ms. McCathern questioned why she was expected to be content with disrespect, hostility, and insubordination that she reported, and then is terminated when she stands up for herself in a way that ensures a respectful and professional work environment.

93.    Ms. McCathern expressed her disappointment that she was being terminated for having an "attitude," yet nothing was done about the hostility and discrimination by Mr. Logan and Ms. Bolyard.

94.    Ms. Green claimed that all of Ms. McCathern's reports were investigated by her and Mr. Loveless.

95.    Ms. McCathern then asked what the investigation revealed, to which Ms. Green said they could not corroborate Ms. McCathern's reports.

96.    Ms. McCathern then thanked them for the opportunity, gathered her belongings, and exited the premises.

97.    It soon became apparent to Ms. McCathern that her reports were not adequately investigated.

98.    Ms. McCathern knew that Anthony Parker, a dock worker, had previously reported to HR that he was uncomfortable with the way Ms. McCathern was treated by both Mr. Logan

package : 000017 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000014 of 000020

and Ms. Bolyard. The dock was connected to Ms. McCathern's office, allowing Mr. Parker to observe many of the above-described incidents. Yet, Ms. Green inaccurately reported that no other employee substantiated her reports.

## CAUSES OF ACTION[1]

### I. Violation of the Kentucky Civil Rights Act, KRS § 344.040, Race Discrimination

99.    Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

100.   KRS § 344.040(1)(a) prohibits discrimination on the basis of race in employment.

101.   Plaintiff is Black and, therefore, is a member of a racial minority.

102.   Defendant ODFL had the intent to discriminate against Plaintiff in her employment with the Defendant based on the fact that she was Black.

103.   Plaintiff was treated less favorably than similarly situated white co-workers by Defendants due to her race.

104.   Plaintiff was subjected to adverse employment actions, including her termination by Defendant due to her race.

105.   Defendant's actions were intentional, willful, and in reckless disregard of Plaintiff's rights as protected by the Kentucky Civil Rights Act, KRS § 344.040.

### II. Violation of Kentucky Civil Rights Act, KRS § 344.280, Retaliation for Reporting Racial Harassment and Discrimination

106.   Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

107.   Plaintiff engaged in protected activity under the Kentucky Civil Rights Act by making

---

[1] For purposes of clarity, Causes of Action I, III, IV, and V are alleged against Defendant ODFL only. Cause of Action II is alleged against both ODFL and Hausman.

package : 000018 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000015 of 000020

reporting instances of racial harassment and discrimination.

108.   Plaintiff was subjected to adverse actions by Defendants because she engaged in activity protected under the KCRA including, but not limited to the termination of her employment.

109.   A reasonable employee in Plaintiff's position would have found Defendants' actions materially adverse.

110.   There exists a causal connection between Defendants' materially adverse actions toward Plaintiff and her protected activity.

111.   Defendants' asserted reasons for firing Plaintiff were pretextual and false.

112.   Defendants' conduct violated the KCRA's anti-retaliation provision found in KRS 344.280.

113.   As a direct and proximate result of Defendants' actions described herein, Plaintiff has suffered from a loss of income and benefits, emotional stress, and depression, for all of which she should be compensated.

114.   Plaintiff is entitled to all relief, legal and equitable, available under the KCRA.

### III. Violation of KRS 337.285 - Failure to Pay Required Overtime

115.   Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

116.   Pursuant to KRS 337.010(1)(d), Defendant ODFL is an "employer" as that term is used within the context of the Kentucky Wages and Hours Act.

117.   Pursuant to KRS 337.010(1)(e), Plaintiff was an "employee" of Defendant ODFL as that term is used within the context of the Kentucky Wages and Hours Act.

118.   Plaintiff was required to perform significant work as a night-shift clerk. The night-shift

package : 000019 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000016 of 000020

clerk positions is not excluded from the definition of "employee" under any provision of KRS 337.010(2)(a) and is not exempt from overtime pay requirements.

119.    Plaintiff routinely worked in excess of 40 hours per week for Defendant. Plaintiff often worked at least 55-60 hours per week.

120.    During the course of Plaintiff's employment, Defendant violated KRS 337.285 by failing to compensate Plaintiff at a rate of one and one-half times her regular rate of pay for hours worked in excess of forty per week.

121.    Defendant never paid Plaintiff at a rate of one and one-half times her regular rate of pay for hours worked in excess of forty per week.

122.    Defendant made no good-faith effort to comply with the KWHA with respect to the compensation of Plaintiff, but rather willfully, knowingly, and/or recklessly violated the KWHA and its corresponding state regulations by failing to properly compensate Plaintiff with overtime wages in accordance with KRS 337.285.

123.    As a direct result of Defendant's violations of the KWHA, Plaintiff has been deprived of her rightful overtime compensation in an amount to be determined at trial, and is entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to KRS 337.385.

### *IV. Violation of KRS 337.355*

124.    Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

125.    KRS 337.355 requires employers grant their employees a reasonable period for lunch as close in time as possible to the middle of an employee's shift.

126.    Pursuant to KRS 337.010(1)(d), Defendant ODFL is an "employer" as that term is used

within the context of the Kentucky Wages and Hours Act.

127.   Pursuant to KRS 337.010(1)(e), Plaintiff was an "employee" of Defendant ODFL as that term is used within the context of the Kentucky Wages and Hours Act.

128.   Defendant routinely denied lunch periods to Plaintiff throughout the course of her employment with Defendant.

129.   By denying Plaintiff a reasonable period for lunch, Defendant violated the mandatory provisions of KRS 337.355.

130.   KRS 446.070 permits a person injured by the violation of any Kentucky statute to recover from the perpetrator such damages as she sustained by reason of the violation.

131.   As a result of Defendant's statutory violations, Plaintiff was made to suffer emotional and mental distress for which she should recover substantial damages from Defendant.

### V. Violation of KRS 337.365

132.   Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

133.   KRS 337.365 states, "[n]o employer shall require any employee to work without a rest period of at least ten (10) minutes during each four (4) hours worked...This shall be in addition to the regularly scheduled lunch period…"

134.   Pursuant to KRS 337.010(1)(d), Defendant ODFL is an "employer" as that term is used within the context of the Kentucky Wages and Hours Act.

135.   Pursuant to KRS 337.010(1)(e), Plaintiff was an "employee" of Defendant ODFL as that term is used within the context of the Kentucky Wages and Hours Act.

136.   Defendant routinely denied rest periods to Plaintiff  throughout the course of her employment with defendant.

package : 000021 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000018 of 000020

Filed        25-CI-002839    04/13/2025        David L. Nicholson, Jefferson Circuit Clerk

137.    By denying Plaintiff rest periods during the course of her employment, Defendant violated the mandatory provisions of KRS 337.365.

138.    KRS 446.070 permits a person injured by the violation of any Kentucky statute to recover from the perpetrator such damages as she sustained by reason of the violation.

139.    As a result of Defendant's statutory violations, Plaintiff was made to suffer emotional and mental distress for which she should recover substantial damages from Defendant.

## PRAYER FOR RELIEF

140.    As a direct and proximate result of Defendants' wrongful acts toward her, Plaintiff has been denied wages and benefits of employment, for which she should recover substantial, actual, and compensatory damages from Defendant.

141.    As a direct and proximate result of the Defendants' wrongful acts toward her, Plaintiff has suffered from emotional distress and mental anxiety, for all of which she should be compensated.

142.    WHEREFORE, Plaintiff prays that this Court:

   a.    Declare Defendants' conduct to be in violation of Plaintiff's rights;

   b.    Award Plaintiff damages she sustained by reason of Defendants' wrongful acts, in an amount to be proven at trial, including, but not limited to, any and all compensatory and consequential damages suffered;

   c.    Award Plaintiff an amount to be proven at trial for the humiliation, embarrassment, personal indignity, apprehension about past, current and future well-being, emotional distress, and mental anguish which have been caused to her by the Defendants' wrongful acts;

   d.    Award Plaintiff any and all equitable relief to which she is entitled, including reinstatement;

   e.    Award Plaintiff pre- and post-judgment statutory interest;

   f.     Liquidated damages pursuant to KRS 337.385

package : 000022 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM : 000019 of 000020

Filed        25-CI-002839    04/13/2025        David L. Nicholson, Jefferson Circuit Clerk

g.    Award Plaintiff interest, costs, and attorneys' fees pursuant to KRS 344.450 and KRS 337.385; and,

h.    Grant Plaintiff such further relief as this Court may deem just and proper.

## JURY DEMAND

143.    Plaintiff demands a jury to try all issues triable by jury.

Respectfully Submitted,

*s/ P. Stewart Abney*
P. Stewart Abney
**ABNEY LAW OFFICE, PLLC**
1000 Cherokee Road
Suite Seven
Louisville, Kentucky 40204
T: (502) 498-8585
E: stewart@abneylegal.com
*Counsel for Plaintiff*

package : 000023 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

COM.: 000020 of 000020

CASE NUMBER _____          .        .                COMMONWEALTH OF KENTUCKY
                                                            JEFFERSON CIRCUIT COURT
                                                                      DIVISION ___

*Electronically Filed*

DYMOND MCCATHERN                                                    PLAINTIFF

v.

OLD DOMINION FREIGHT LINE, INC.                                    DEFENDANT
1400 SOUTH LOUIS COLEMAN JR. DRIVE
LOUISVILLE, KENTUCKY 40211

        SERVE:   C T Corporation System
                306 West Main Street
                Suite 512
                Frankfort, Kentucky 40601

MIKE HAUSMAN                                                       DEFENDANT
1400 SOUTH LOUIS COLEMAN JR. DRIVE
LOUISVILLE, KENTUCKY 40211

        SERVE:   Mike Hausman
                1400 South Louis Coleman Jr. Drive
                Louisville, Kentucky 40211

## COMPLAINT
*Trial by Jury Demanded*

Comes now Plaintiff, Dymond McCathern ("Ms. McCathern" or "Plaintiff"), by and through her counsel, and for her Complaint against the Defendants, Old Dominion Freight Line, Inc. and Mike Hausman, (hereinafter "ODFL" or "Hausman" individually, or "Defendants" collectively). Ms. McCathern brings this action to remedy the Defendants' unlawful conduct and secure any and all relief necessary to restore her rights under Kentucky law and to compensate her for damages sustained. In accordance therewith, Plaintiff alleges as follows:

package : 000024 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000001 of 000020

Filed    25-CI-002839    04/13/2025    David L. Nicholson, Jefferson Circuit Clerk

## PARTIES

1.    Ms. McCathern resides in Louisville, Kentucky.  Ms. McCathern was an employee of ODFL from October 2022 to January 14, 2024.

2.    Defendant ODFL is a foreign corporation doing business in the Commonwealth of Kentucky. ODFL's principal place of business is 500 Old Dominion Way, Thomasville, North Carolina 27360. ODFL owns and operates a logistics facility in Louisville, Kentucky.

## JURISDICTION AND VENUE

3.    Plaintiff's causes of action are brought pursuant to the Kentucky Civil Rights Act ("KCRA"), KRS 344.040 and KRS 344.280.

4.    Jurisdiction is proper in the Jefferson Circuit Court pursuant to KRS § 23A.010(1).

5.    Venue in this action is proper in the Jefferson Circuit Court pursuant to KRS 452.460(1) because, *inter alia*, injury arising from these events was done to Plaintiff in Jefferson County.

## FACTUAL ALLEGATIONS

1.    In or around October 2022, ODFL hired Ms. McCathern as a Pickup and Delivery Supervisor.

2.    Her duties consisted largely of supervising and directing tasks to drivers, managing the dock, and completing any related paperwork.

3.    Ms. McCathern strove to maintain a productive and respectful work environment and took great pride in her work and the contributions she made to the company. She was very committed to her role and performed her job satisfactorily.

4.    In the latter half of 2024, Ms. McCathern began experiencing problems with the behavior

Filed    25-CI-002839    04/13/2025    David L. Nicholson, Jefferson Circuit Clerk    2

package : 000025 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000002 of 000020

of Leann Bolyard, a driver whom she supervised.

5.      Specifically, Ms. Bolyard's conduct in the workplace was in contravention of company policies and created a hostile work environment for Ms. McCathern and other ODFL employees.

6.      Ms. Bolyard made many sexual innuendos and displayed inappropriate behavior in the workplace.

7.      For example, on one occasion, Ms. Bolyard was in the office where Ms. McCathern was working and held an empty paper towel roll in front of a male co-worker and asked, "Can it fit in it?" – alluding to sexual conduct.

8.      On another occasion, Ms. Bolyard came into the office where Ms. McCathern was along with other employees and supervisors and observed a piece of gummy candy shaped like female breasts. Ms. McCathern then observed Ms. Bolyard looked at the candy and said, "Oh, I have these too," and proceeded to shake her breasts and buttocks. Ms. McCathern was made extremely uncomfortable by this.

9.      Shortly after that, Ms. Bolyard, incredibly, accused Ms. McCathern of having her "excommunicated" from her church – which was completely false.

10.     Ms. McCathern learned that Ms. Bolyard was "excommunicated" from her church because a churchgoer had learned of Ms. Bolyard shaking her breast and buttocks in front of her co-workers.

11.     Ms. McCathern assured Ms. Bolyard that she had nothing to do with that.

12.     Notably, Ms. Bolyard did not accuse the male co-worker who witnessed the incident, and just so happens to be a member of the same church.

13.     Nevertheless, Ms. Bolyard insisted that Ms. McCathern was responsible for the fallout with

package : 000026 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000003 of 000020

her church, and stated, "If I lose my job, you better believe you're going to lose your job, too."

14.    Ms. McCathern reported Ms. Bolyard's accusations to Human Resources, and the underlying incident, but Ms. Bolyard was never disciplined.

15.    Ms. Bolyard treated Ms. McCathern with hostility and less favorably than her White co-workers.

16.    For example, Ms. Bolyard frequently hung up the phone on Ms. McCathern when she was directing Ms. Bolyard to perform a task.

17.    On the other hand, when Ms. Bolyard would call Ms. McCathern to complain or berate her in a disrespectful and profane manner, Ms. McCathern would likewise end the conversation. Ms. Bolyard would call back and threaten Ms. McCathern, making comments such as, but not limited to, "hang up on me one more time, and all hell will break loose."

18.    Ms. Bolyard, on multiple occasions, would call Ms. McCathern racial slurs to ODFL drivers, including the N-word.

19.    In particular, Ms. Bolyard would make these comments to John Schmitt, another driver, who was quite uncomfortable with her language.

20.    Mr. Schmitt relayed Ms. Bolyard's comments to Ms. McCathern, stating that he believed she was racist and that he had already reported it to Human Resources and management.

21.    Ms. McCathern had already dealt with racist attitudes from ODFL's drivers.

22.    In August or September 2024, Ms. McCathern reported to Mike Hausman, ODFL Service Center Manager, and the Human Resources department that employees, specifically drivers, were making racially charged comments, including statements such as "Black

package : 000027 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000004 of 000020

package : 000028 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000005 of 000020

Lives Matter is bullshit to them," "That [BLM] only came about when Obama was in office," and "The reason Joe Biden is president is because we allow him to come to the Black neighborhoods and put these signs in our yard."

23. When Ms. McCathern conveyed these concerns to Mr. Housman, she felt deeply humiliated and was visibly emotional, to the point of tears.

24. The distress caused by the treatment she was experiencing from employees led her to leave work for the day.

25. After leaving, she contacted HR to explain why she had to leave and to request the use of her PTO due to the emotional toll of the situation.

26. During her conversation with Mr. Housman, another employee, Andrea Spencer, was present in the office. Although Ms. Spencer was not Ms. McCathern's supervisor, Mr. Housman said she had to be there as a witness. However, when Ms. McCathern later spoke with Mary in HR, she was informed that Ms. Spencer should not have been present during the meeting.

27. In addition to Ms. Bolyard's accusation that Ms. McCathern caused her to be "excommunicated" from church, Ms. Bolyard frequently made baseless accusations about Ms. McCathern to other employees.

28. On one occasion, Ms. Bolyard was spreading rumors in the workplace that Ms. McCathern favored Earl Civils, another driver, because "he was allowed to get more hours than everyone else." Not only was this untrue, but it created a negative perception of Ms. McCathern in the eyes of her subordinates.

29. Ms. McCathern was the only Black female in a supervisor position during the nightshift, and the only supervisor that Ms. Bolyard treated this way.

Filed            25-CI-002839    04/13/2025            David L. Nicholson, Jefferson Circuit Clerk

30. At one point, Ms. Bolyard approached Ms. McCathern and began to ramble about how she is "not racist" – when Ms. McCathern had never made such an assertion to Ms. Bolyard before.

31. The night-shift clerk was a high turnover position.

32. The night-shift clerk position was an hourly position and was not exempt from overtime requirements.

33. Management delegated night-shift clerk responsibilities to Ms. McCathern without additional pay or equal distribution among other supervisors. Ms. McCathern was not the lowest seniority supervisor, and there was no other reason why Ms. McCathern was required to perform another position's duties in addition to her own.

34. The clerk's responsibilities consisted of billing, data entry, scanning, and hazmat paperwork, among other clerical duties.

35. This frequently resulted in Ms. McCathern working hours past her shift – which she did not have the option to accept or decline.

36. Mark Logan, the Assistant Manager at this ODFL location, frequently made deeply offensive and racially charged remarks, in the presence of Black employees – including Ms. McCathern.

37. Specifically, Mr. Logan said that he "shot a monkey." When Ms. McCathern questioned what he meant, Mr. Logan would simply repeat, "I've shot a monkey."

38. Additionally, Mr. Logan made a point to inform Ms. McCathern that he resides on a "slave cemetery."

39. On or around September 30, 2024, Mr. Logan issued Ms. McCathern a "final" Employee Performance Review ("EPR") and falsely claimed MS. McCathern had been insubordinate.

package : 000029 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000006 of 000020

Filed    25-CI-002839    04/13/2025    David L. Nicholson, Jefferson Circuit Clerk

40.    The night that was the subject of the EPR was quite busy, and Ms. McCathern had been working for twelve hours without a lunch break – performing both her supervisory duties and the clerk's responsibilities.

41.    Mr. Logan was also working that night. While he is the Assistant Manager, he tends to micromanage the supervisors – including Ms. McCathern – attempting to interfere with their independent judgment and performance of their positional responsibilities, rather than guiding their decision-making and performance.

42.    This night in particular, Mr. Logan was frustrated with how busy the supervisors were. Mr. Logan wanted a trailer door moved, but Ms. McCathern had already asked the driver to move some trailers on their side because other drivers were outside waiting for a place to put their trailers.

43.    For as long as Ms. McCathern worked at ODFL, it had always been protocol to maneuver the trailers in this manner during busy times.

44.    When she explained this to Mr. Logan, he became angry and stated that he had previously directed Ms. McCathern to order drivers to pull to his side first.

45.    Ms. McCathern questioned this logic, as they need both sides cleared regardless. She further explained that she did not tell the drivers what side to do first but merely asked them to move the trailers.

46.    Mr. Logan raised his voice, stating, "Well, you need to listen to me! You do understand that I am your boss." Ms. McCathern replied, "I understand that. Do you want to go into the office to talk about it?"

47.    Several employees surrounded Mr. Logan and Ms. McCathern as this conversation unfolded.

Filed    25-CI-002839    04/13/2025    David L. Nicholson, Jefferson Circuit Clerk    7

package : 000030 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000007 of 000020

48.   Mr. Logan refused to speak privately, and stated, "We don't have to go in there and talk about it. I'll talk to you about it tomorrow."

49.   Ms. McCathern offered to go into the office because she began to feel severely humiliated as she was disrespected and yelled at by Mr. Logan in a room full of her co-workers and subordinates.

50.   As the night progressed, Mr. Logan became more and more agitated at the idea of not getting his way. Eventually, Mr. Logan began yelling, using profanity, and threw his clipboard on the ground and his pencil at the wall. Ms. McCathern was doing her job while watching it all unfold and became very uncomfortable and scared.

51.   About two hours past the end of Ms. McCathern's scheduled shift, she finally finished all her supervisory duties and the assigned clerical work. She then walked out of the office and past Mr. Logan, telling him to have a good night.

52.   Mr. Logan questioned, "Where do you think you're going?" to which Ms. McCathern said she was going home. Mr. Logan said nothing in response and left.

53.   Ms. McCathern gathered her things and began walking out, when Mr. Logan followed behind and asked again, "Where are you going?" to which Ms. McCathern repeated that she was going home and asked if there was something else he needed or if he needed her to stay. Mr. Logan then rolled his eyes at her, turned around, and went back into the office.

54.   Ms. McCathern was confused and didn't know why Mr. Logan was acting this way, but she had already performed her responsibilities for the night and left around one to two hours after the conclusion of her scheduled shift.. About 15 minutes later, Ms. McCathern received a call from Mr. Logan, asking, "Did you leave?" to which she said "Yes, I am on my way home." Mr. Logan said, "I told you not to leave," to which Ms. McCathern

package : 000031 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000008 of 000020

reminded him that she had specifically asked whether he needed her to stay, and he said
nothing.

55.    On or about October 2, 2024, Ms. McCathern reported Mr. Logan's behavior to Mike
       Hausman, ODFL Service Center Manager, who thanked her for informing him of the
       matter, and stated he would speak with Mr. Logan because he should not be behaving in
       that manner.

56.    Mr. Hausman then began to excuse Mr. Logan's hostility and aggression in the workplace
       because "he is military," and every person has their own "management style." Ms.
       McCathern did not accept this excuse, and expressed that, regardless of his military status,
       his behavior is inexcusable in the workplace.

57.    On or about Friday, October 4, 2024, Ms. McCathern emailed Mary Green, HR Area
       Manager, and Ernest Loveless, HR Development Regional Manager, requesting a call to
       report Ms. Bolyard's actions.

58.    Shortly thereafter, Ms. Green called Ms. McCathern, where she reported that Ms. Bolyard
       called her the N-word in multiple conversations with other employees in the workplace,
       which created a hostile work environment for her and other employees.

59.    Ms. McCathern further reported Ms. Bolyard's insubordination, disrespect, threats, and
       unsubstantiated accusations as detailed above. Despite a corroborating report from Mr.
       Schmitt, Ms. Bolyard was never disciplined for her behavior.

60.    There are no HR personnel on-site at ODFL's Louisville location. The closest HR is located
       in Indianapolis, IN – where Mr. Loveless and Ms. Green are located, and who are the point
       of contact for employees at the ODFL location Louisville, KY. Michael Ferrell is the
       Regional HR & Development Manager and supervises Mr. Loveless and Ms. Green.

package : 000032 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000009 of 000020

61.    On Friday, October 11, 2024, around 8:00 PM, Ms. McCathern emailed multiple individuals within the HR Department, including Mr. Loveless, Ms. Green, James Siefert, Matthew Rimi, and DeeDee Cox, the HR Department Vice President, and attached a letter outlining her complaint, and all of the above-incidents of discrimination and harassment she had experienced at the hands of management and subordinates at ODFL in the previous several months.

62.    Ms. McCathern outlined what actually transpired on September 30, 2024, as opposed to Mr. Logan's inaccurate account of events.

63.    She informed HR that surveillance footage and other employees can corroborate her story. Ms. McCathern further questioned the issuance of a "final" EPR, considering that she had no recent write ups related to job performance or other similar incidents.

64.    Only 11 minutes later, Ms. Cox replied that, since it appeared Ms. McCathern had already spoken with Mr. Loveless and Ms. Green, that she would have Jerry McGlown reach out to her, and that he reports directly to Ms. Cox. Mr. McGlown never contacted Ms. McCathern.

65.    That same night, October 11, 2024, at 11:17 PM, Mr. Hausman issued Ms. McCathern a "final" write up for "overall poor job performance" based on Mr. Logan's version of events as set forth in her EPR.

66.    Mr. Logan alleged that Ms. McCathern was given "a task to make sure the next driver to the window pulled some loaded trailers and replaced them with empties so we could continue to load freight. This was noticed about 30 min later and [Mr. Logan] questioned [Ms. McCathern] about it and she changed the plan, therefore, failing to execute the task that was given at the time."

package : 000033 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000010 of 000020

Filed          25-CI-002839    04/13/2025          David L. Nicholson, Jefferson Circuit Clerk

67.    It continued to read that, around 10:30 PM.  Mr. Logan asked Ms. McCathern:

> [H]ow many drivers were still out? [Ms. McCathern] said she still had Harry [driver] to come back and process, [Mr. Logan] ask[ed] her to stay until Harry (*sic*) arrived back (*sic*) and the work was completed. [Mr. Logan] came back from the dock 15 min later and [Ms. McCathern] was gone. [Mr. Logan] called her and she said that Harry was the last of the drivers and that she had left. This was once again the failure to follow and execute a task given.

68.    On Thursday, October 17, 2024, Mr. Ferrell emailed Ms. McCathern, requesting she call him the following day – which she did. After getting off the phone with Mr. Ferrell, Ms. McCathern emailed him a summary of their phone conversation. Therein, Mr. Ferrell informed Ms. McCathern that employees were interviewed and none of them substantiated her report that Mr. Logan was screaming, cursing, and throwing objects in the workplace.

69.    However, Ms. McCathern previously provided HR with a timeframe of when the acts occurred to confirm on the surveillance footage. Mr. Ferrell further confirmed that HR did not investigate the video surveillance regarding object-throwing because of the "timing of the reported behavior," but Ms. McCathern reported the incident two days after it occurred – with plenty of time to obtain and review the relevant footage.

70.    Mr. Ferrell further indicated that Ms. McCathern's EPR was submitted prior to her report of discrimination and hostile work environment, however, Ms. McCathern had made multiple reports prior to the incident on September 30, 2024.

71.    He further stated that any further reports she made would be forwarded to Mr. Loveless, and Ms. McCathern reminded Mr. Ferrell that she had yet to receive clarification on the allegations prompting her final EPR from HR.

72.    On or around the week of December 16, 2024, ODFL management brought in a new employee and ordered Ms. McCathern to train them without providing her prior notice.

package : 000034 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000011 of 000020

Filed        25-CI-002839    04/13/2025        David L. Nicholson, Jefferson Circuit Clerk

Ms. McCathern explained that this was not communicated to her and would require her to work overtime.

73.    None of Ms. McCathern's White counterparts were required to work overtime, and Ms. McCathern was frequently held past her shift to perform duties outside of her job description.

74.    Nonetheless, Ms. McCathern did as ordered and trained the employee that night. Ms. McCathern and the trainee engaged in a casual conversation during downtime and in-between tasks.

75.    At one point during the night while Ms. McCathern and the trainee were loading, Mr. Logan stated, "Is anybody listening to me? I've been talking to y'all, asking y'all questions, and y'all been ignoring me…Y'all been talking about everything else, but work."

76.    Ms. McCathern and the trainee looked at one another, confused, and Ms. McCathern asked, "What have you asked me that I haven't answered?" – to which Mr. Logan did not respond.

77.    ODFL employees and management frequently engage in casual, non-work-related conversations during their downtime or between tasks. That same day, Mr. Logan and other employees were having a conversation about NFL football and politics in the workplace.

78.    Ms. McCathern reported Mr. Logan's hypocrisy to Mr. Hausman, who laughed at the situation and brushed her report off entirely.

79.    The following week, Monday, December 23, 2024, Ms. McCathern emailed Mr. Hausman, Ms. Green, and Mr. Loveless regarding the ongoing issues that had been affecting her ability to perform her job and creating a hostile work environment. Therein, she reported the recently formulated allegations by Mr. Logan, which evidenced her less favorable treatment by him as detailed above. She further expressed her frustration with the failure

package : 000035 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000012 of 000020

Filed    25-CI-002839    04/13/2025    David L. Nicholson, Jefferson Circuit Clerk

to take steps to prevent this discriminatory behavior from continuing.

80. On Thursday, December 26, 2024, Mr. Loveless replied that Ms. Green would investigate and reach out if further information was needed from Ms. McCathern. The next day, December 27, 2024, Ms. Green replied and requested Ms. McCathern call when she was available – which she did and reported the more recent issues with Mr. Logan as stated above.

81. Ms. McCathern never heard back from Ms. Green regarding the investigation of her reports, and no steps were taken to protect Ms. McCathern from further unfair treatment.

82. On or around January 14, 2024, Ms. McCathern was called into Mr. Hausman's office along with Mr. Logan, and, present via telephone, Ms. Green. During the meeting, Mr. Hausman stated that Ms. McCathern has recently gone down a path of "poor job performance," and stated that her employment with ODFL was terminated.

83. Mr. Hausman then asked if Ms. McCathern had questions, and she asked, "What are the job duties that have not been met?" – to which Mr. Hausman stated, "The EPRs…performance reviews…we've done over the last two years…that's about it."

84. Ms. McCathern asked for that in writing, and a document indicating her separation from employment.

85. As Mr. Hausman was asking, "We're not obligated to give a document of anything, are we?" Ms. Green interrupted, "no…no, we don't. You'll get something from benefits showing separation of employment."

86. Ms. McCathern then asked what job duties she had not met recently – i.e., since their last discussion regarding the final EPR.

87. Mr. Hausman stated, "the mis-pickups, the driver conversations…"

package : 000036 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000013 of 000020

88.     In response, Ms. McCathern asked, "What driver conversations? I'm just needing clarification."

89.     Mr. Hausman then stated, "the attitude…and just the overall attitude."

90.     Ms. McCathern was surprised, as Mr. Hausman had never mentioned her attitude before. She asked, "What attitude?" and stated that Mr. Logan rolled his eyes at her just that morning when she walked in.

91.     Mr. Hausman then shifted his reasoning and claimed that drivers were "complaining."

92.     In reply, Ms. McCathern questioned why she was expected to be content with disrespect, hostility, and insubordination that she reported, and then is terminated when she stands up for herself in a way that ensures a respectful and professional work environment.

93.     Ms. McCathern expressed her disappointment that she was being terminated for having an "attitude," yet nothing was done about the hostility and discrimination by Mr. Logan and Ms. Bolyard.

94.     Ms. Green claimed that all of Ms. McCathern's reports were investigated by her and Mr. Loveless.

95.     Ms. McCathern then asked what the investigation revealed, to which Ms. Green said they could not corroborate Ms. McCathern's reports.

96.     Ms. McCathern then thanked them for the opportunity, gathered her belongings, and exited the premises.

97.     It soon became apparent to Ms. McCathern that her reports were not adequately investigated.

98.     Ms. McCathern knew that Anthony Parker, a dock worker, had previously reported to HR that he was uncomfortable with the way Ms. McCathern was treated by both Mr. Logan

and Ms. Bolyard. The dock was connected to Ms. McCathern's office, allowing Mr. Parker to observe many of the above-described incidents. Yet, Ms. Green inaccurately reported that no other employee substantiated her reports.

## CAUSES OF ACTION[1]

### I. Violation of the Kentucky Civil Rights Act, KRS § 344.040, Race Discrimination

99.    Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

100.    KRS § 344.040(1)(a) prohibits discrimination on the basis of race in employment.

101.    Plaintiff is Black and, therefore, is a member of a racial minority.

102.    Defendant ODFL had the intent to discriminate against Plaintiff in her employment with the Defendant based on the fact that she was Black.

103.    Plaintiff was treated less favorably than similarly situated white co-workers by Defendants due to her race.

104.    Plaintiff was subjected to adverse employment actions, including her termination by Defendant due to her race.

105.    Defendant's actions were intentional, willful, and in reckless disregard of Plaintiff's rights as protected by the Kentucky Civil Rights Act, KRS § 344.040.

### II. Violation of Kentucky Civil Rights Act, KRS § 344.280, Retaliation for Reporting Racial Harassment and Discrimination

106.    Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

107.    Plaintiff engaged in protected activity under the Kentucky Civil Rights Act by making

---

[1] For purposes of clarity, Causes of Action I, III, IV, and V are alleged against Defendant ODFL only. Cause of Action II is alleged against both ODFL and Hausman.

reporting instances of racial harassment and discrimination.

108.  Plaintiff was subjected to adverse actions by Defendants because she engaged in activity
       protected under the KCRA including, but not limited to the termination of her
       employment.

109.  A reasonable employee in Plaintiff's position would have found Defendants' actions
       materially adverse.

110.  There exists a causal connection between Defendants' materially adverse actions toward
       Plaintiff and her protected activity.

111.  Defendants' asserted reasons for firing Plaintiff were pretextual and false.

112.  Defendants' conduct violated the KCRA's anti-retaliation provision found in KRS
       344.280.

113.  As a direct and proximate result of Defendants' actions described herein, Plaintiff has
       suffered from a loss of income and benefits, emotional stress, and depression, for all of
       which she should be compensated.

114.  Plaintiff is entitled to all relief, legal and equitable, available under the KCRA.

### III. Violation of KRS 337.285 - Failure to Pay Required Overtime

115.  Plaintiff incorporates by reference each and every allegation contained in the proceeding
       paragraphs as if fully set forth with particularity herein.

116.  Pursuant to KRS 337.010(1)(d), Defendant ODFL is an "employer" as that term is used
       within the context of the Kentucky Wages and Hours Act.

117.  Pursuant to KRS 337.010(1)(e), Plaintiff was an "employee" of Defendant ODFL as that
       term is used within the context of the Kentucky Wages and Hours Act.

118.  Plaintiff was required to perform significant work as a night-shift clerk. The night-shift

Filed        25-CI-002839    04/13/2025        David L. Nicholson, Jefferson Circuit Clerk

clerk positions is not excluded from the definition of "employee" under any provision of KRS 337.010(2)(a) and is not exempt from overtime pay requirements.

119.  Plaintiff routinely worked in excess of 40 hours per week for Defendant. Plaintiff often worked at least 55-60 hours per week.

120.  During the course of Plaintiff's employment, Defendant violated KRS 337.285 by failing to compensate Plaintiff at a rate of one and one-half times her regular rate of pay for hours worked in excess of forty per week.

121.  Defendant never paid Plaintiff at a rate of one and one-half times her regular rate of pay for hours worked in excess of forty per week.

122.  Defendant made no good-faith effort to comply with the KWHA with respect to the compensation of Plaintiff, but rather willfully, knowingly, and/or recklessly violated the KWHA and its corresponding state regulations by failing to properly compensate Plaintiff with overtime wages in accordance with KRS 337.285.

123.  As a direct result of Defendant's violations of the KWHA, Plaintiff has been deprived of her rightful overtime compensation in an amount to be determined at trial, and is entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to KRS 337.385.

### IV. Violation of KRS 337.355

124.  Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

125.  KRS 337.355 requires employers grant their employees a reasonable period for lunch as close in time as possible to the middle of an employee's shift.

126.  Pursuant to KRS 337.010(1)(d), Defendant ODFL is an "employer" as that term is used

package : 000040 of 000043    Presiding Judge: HON. JESSICA E. GREEN (630423)    IRPD : 000017 of 000020

within the context of the Kentucky Wages and Hours Act.

127.  Pursuant to KRS 337.010(1)(e), Plaintiff was an "employee" of Defendant ODFL as that term is used within the context of the Kentucky Wages and Hours Act.

128.  Defendant routinely denied lunch periods to Plaintiff throughout the course of her employment with Defendant.

129.  By denying Plaintiff a reasonable period for lunch, Defendant violated the mandatory provisions of KRS 337.355.

130.  KRS 446.070 permits a person injured by the violation of any Kentucky statute to recover from the perpetrator such damages as she sustained by reason of the violation.

131.  As a result of Defendant's statutory violations, Plaintiff was made to suffer emotional and mental distress for which she should recover substantial damages from Defendant.

### *V. Violation of KRS 337.365*

132.  Plaintiff incorporates by reference each and every allegation contained in the proceeding paragraphs as if fully set forth with particularity herein.

133.  KRS 337.365 states, "[n]o employer shall require any employee to work without a rest period of at least ten (10) minutes during each four (4) hours worked...This shall be in addition to the regularly scheduled lunch period…"

134.  Pursuant to KRS 337.010(1)(d), Defendant ODFL is an "employer" as that term is used within the context of the Kentucky Wages and Hours Act.

135.  Pursuant to KRS 337.010(1)(e), Plaintiff was an "employee" of Defendant ODFL as that term is used within the context of the Kentucky Wages and Hours Act.

136.  Defendant routinely denied rest periods to Plaintiff throughout the course of her employment with defendant.

package : 000041 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000018 of 000020

137.    By denying Plaintiff rest periods during the course of her employment, Defendant violated the mandatory provisions of KRS 337.365.

138.    KRS 446.070 permits a person injured by the violation of any Kentucky statute to recover from the perpetrator such damages as she sustained by reason of the violation.

139.    As a result of Defendant's statutory violations, Plaintiff was made to suffer emotional and mental distress for which she should recover substantial damages from Defendant.

## PRAYER FOR RELIEF

140.    As a direct and proximate result of Defendants' wrongful acts toward her, Plaintiff has been denied wages and benefits of employment, for which she should recover substantial, actual, and compensatory damages from Defendant.

141.    As a direct and proximate result of the Defendants' wrongful acts toward her, Plaintiff has suffered from emotional distress and mental anxiety, for all of which she should be compensated.

142.    WHEREFORE, Plaintiff prays that this Court:

    a.    Declare Defendants' conduct to be in violation of Plaintiff's rights;

    b.    Award Plaintiff damages she sustained by reason of Defendants' wrongful acts, in an amount to be proven at trial, including, but not limited to, any and all compensatory and consequential damages suffered;

    c.    Award Plaintiff an amount to be proven at trial for the humiliation, embarrassment, personal indignity, apprehension about past, current and future well-being, emotional distress, and mental anguish which have been caused to her by the Defendants' wrongful acts;

    d.    Award Plaintiff any and all equitable relief to which she is entitled, including reinstatement;

    e.    Award Plaintiff pre- and post-judgment statutory interest;

    f.    Liquidated damages pursuant to KRS 337.385

package : 000042 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000019 of 000020

g.    Award Plaintiff interest, costs, and attorneys' fees pursuant to KRS 344.450 and KRS 337.385; and,

h.    Grant Plaintiff such further relief as this Court may deem just and proper.

### JURY DEMAND

143.    Plaintiff demands a jury to try all issues triable by jury.

Respectfully Submitted,

*s/ P. Stewart Abney*
P. Stewart Abney
**ABNEY LAW OFFICE, PLLC**
1000 Cherokee Road
Suite Seven
Louisville, Kentucky 40204
T: (502) 498-8585
E: stewart@abneylegal.com
*Counsel for Plaintiff*

package : 000043 of 000043

Presiding Judge: HON. JESSICA E. GREEN (630423)

IRPD : 000020 of 000020